UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN DOE #1, JOHN DOE #2, JOHN DOE #3, JOHN DOE #4, and JOHN DOE #5, | **COMPLAINT** |
| Plaintiffs, | Case No.: 5:18-cv-496 (FJS/DEP) |
| v. | |
| SYRACUSE UNIVERSITY, KENT SYVERUD, individually and as Chancellor of Syracuse University, PAMELA PETER, individually and as Assistant Dean of Student Rights and Affairs and the Director of the Office of Student Rights and Responsibilities, ROBERT HRADSKY, individually and as Syracuse University Dean of Students and Associate Vice President of the Student Experience, TERESA ABI-NADER DAHLBERG, individually and as the Dean of the College of Engineering and Computer Science, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs, JOHN DOE #1, JOHN DOE #2, JOHN DOE #3, JOHN DOE #4, and JOHN DOE #5, by and through their attorneys, Smith, Sovik, Kendrick & Sugnet, P.C., complain of Defendants, SYRACUSE UNIVERSITY, KENT SYVERUD, individually and as Chancellor of Syracuse University, PAMELA PETER, individually and as Assistant Dean of Student Rights and Affairs and the Director of the Office of Student Rights and Responsibilities, ROBERT HRADSKY, individually and as Syracuse University Dean of Students and Associate Vice President of the Student Experience, TERESA ABI-NADER DAHLBERG, individually and as the Dean of the College of Engineering and Computer Science, as follows:

## INTRODUCTION

1.      Plaintiffs are students at Syracuse University and are prospective members of the Syracuse University chapter of Theta Tau, a professional engineering fraternity at the Syracuse University.  On March 30, 2018, as was Theta Tau tradition, Plaintiffs performed a satirical skit— a roast—of the Theta Tau brothers.  The video was privately available to Syracuse University Theta Tau members, but no one else.  Over two weeks later, an unknown party accessed the Theta Tau's private Facebook group, recorded the video, and disseminated it to Syracuse University Officials and *The Daily Orange* without authorization or consent.

2.      Indeed, as the Senior Vice President of Enrollment and the Student Experience, Dolan Evanovich, stated regarding the investigation and ensuing disciplinary process: "We are really trying to compress this timeline."   But, in the name of "compress[ing] the timeline," Defendants proclaimed guilt by association without any investigation.  Within minutes of the roast recordings leaking, Defendants had effectively concluded the investigation; Defendants had: (1) expelled the fraternity for nothing more than being identifiable in the recording; (2) identified Theta Tau as the organization in the video to the community, outing Plaintiffs and their organization and subjecting Plaintiffs to ridicule and scorn; and (3) proclaimed the participants as racist, anti-sematic, homophobic, sexist, and hostile to people with disabilities instead of contextualizing the recording as satirical.  All that Defendants have done is overreact, speed to judgment, and portray the students as "criminals."

3.      During the ensuing eight days, Defendants have dissembled Plaintiffs lives by: (1) branding them as racist, anti-sematic, homophobic, sexist, and hostile to people with disabilities; (2) suspending them from school and barring them from attending classes in the crucial

final weeks of the semester, threatening their academic success and survival; and (3) malign the students personally to salvage Syracuse University's reputation at Plaintiffs' expense.

4.      Plaintiffs now seek equitable relief from this Court, enjoining Defendants from further harming Plaintiffs, and also seek damages for the injury to their reputation caused by Defendants' malicious acts.

## **THE PARTIES**

5.      Plaintiff, JOHN DOE #1, is an individual who is a student at Syracuse University, scheduled to graduate in May 2021, whose permanent domicile is in the State of Massachusetts.

6.      Plaintiff, JOHN DOE #2, is an individual who is a student at Syracuse University, scheduled to graduate in May 2021, who is a Central American citizen with a domicile in John Doe's country of citizenship.

7.      Plaintiff, JOHN DOE #3, is an individual who is a student at Syracuse University, scheduled to graduate in May 2021, whose permanent domicile is in the State of New Jersey.

8.      Plaintiff, JOHN DOE #4, is an individual who is a student at Syracuse University, scheduled to graduate in May 2021, whose permanent domicile is in the State of Colorado.

9.      Plaintiff, JOHN DOE #5, is an individual who is a student at Syracuse University, scheduled to graduate in May 2019, whose permanent domicile is in the State of New Hampshire.

10.     Defendant SYRACUSE UNIVERSITY (the "University") is a private university located in Syracuse, New York.  Upon information and belief, the University operates under a state charter that places the institution under a Board of Trustees, the defendant Trustees of Syracuse University.  Overall guidance of Syracuse University lies in the discretion of its forty-six voting member Board of Trustees. The Board of Trustees is entrusted to select the Chancellor, oversee

all faculty and senior administrative appointments, monitor the budget, supervise the endowment and protect Syracuse University.

11.     Defendant, KENT SYVERUD, is the Chancellor of the University.  In his official capacity as Chancellor and President of the University, he is its chief executive and the chief administrative officer of the University.

12.     Defendant, PAMELA PETER, is the University's Assistant Dean of Student Rights and Affairs and the Director of the Office of Student Rights and Responsibilities.  As the Director of the Office of Student Rights and Responsibilities she has been personally involved in the handling of the disciplinary process as it has been used against Plaintiffs.

13.     Defendant, ROBERT HRADSKY, the Syracuse University Dean of Students and Associate Vice President of the Student Experience, is intimately involved in student disciplinary matters, including this matter, where he contacted Plaintiffs.

14.     Defendant, TERESA ABI-NADER DAHLBERG, the Dean of the College of Engineering and Computer Science, heads the College of Engineering and Computer Science and has released statements to the public and the university community regarding Plaintiffs.

## JURISDICTION AND VENUE

15.     The Court has original subject matter jurisdiction based under 28 U.S.C. § 1331 and 28 U.S.C. § 1332.

16.     Federal question subject matter jurisdiction is established through 42 U.S.C. § 1331 and 42 U.S.C. § 1983.

17.     This Court has subject matter jurisdiction over the claims in this Complaint pursuant to 42 U.S.C. 28 U.S.C. § 1332 as the parties are completely diverse and the amount in controversy exceeds $75,000 exclusive of interest and costs.  The parties' domiciles are as follows:

a.  Plaintiff, JOHN DOE #1, has a permanent domicile in the State of Massachusetts.

b.  Plaintiff, JOHN DOE #2, is a foreign national who has a permanent domicile outside the United States of America.

c.  Plaintiff, JOHN DOE #3, has a permanent domicile in the State of New Jersey.

d.  Plaintiff, JOHN DOE #4, has a permanent domicile in the State of Colorado.

e.  Plaintiff, JOHN DOE #5, has a permanent domicile in the State of New Hampshire.

f.  Upon information and belief, Defendant, SYRACUSE UNIVERSITY, is a New York State chartered educational corporation. *See* N.Y. L. 1887, ch. 414.

g.  Upon information and belief, Defendant, KENT SYVERUD, has a permanent domicile in the State of New York.

h.  Upon information and belief, Defendant, PAMELA PETER, has a permanent domicile in the State of New York.

i.  Upon information and belief, Defendant, ROBERT HRADSKY, has a permanent domicile in the State of New York.

j.  Upon information and belief, Defendant, TERESA ABI-NADER DAHLBERG, has a permanent domicile in the State of New York.

18.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(1) and § 1391(b)(2) since all the defendants reside in this judicial district and the events giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL ALLEGATIONS

19.     Theta Tau is the oldest and largest co-educational fraternity devoted to engineers in the country.  Founded in 1904 at University of Minnesota, the fraternity is committed to fostering its core values in its members.  The fraternity seeks to foster honest, ethical, dependable,

trustworthy future engineers who are respectful of themselves and others. The fraternity's guiding principle is to foster a culture of fraternal bonds that creates lifelong relationships built on mutual respect and professionalism while also helping members balance social, service, and professional activities. Theta Tau prides itself on its diverse membership, which helps foster diversity in the engineering profession. For example, nationwide, two-thirds of Theta Tau members are male and one-third are female as compared to the national average across engineering schools, which is an imbalanced eighty percent male and twenty percent female.

20.     The Tau chapter of the Theta Tau fraternity is based at Syracuse University, a private research university (the "Chapter"). The Chapter had forty-eight members (the "Members") and had a sixteen-member new recruit cohort (the "Prospective Members") at all times relevant to this action. Consistent with Theta Tau's national principles, the Chapter includes twenty-eight diverse members, or forty-four percent of its entire membership. In terms of diversity, the Chapter's demographics make two times more diverse than the College of Engineering & Computer Science at the University. The Chapter includes foreign nationals, African Americans, Asian Americans, Indian Americans, and Central Americans. The Chapter is co-educational, and has a history of including both male and female members.

### The March 30, 2018 Roast

21.     On Friday, March 30, 2018, Plaintiffs (and every other prospective Chapter member) took part in a Theta Tau Chapter tradition: a "roast" of the Chapter members (the "Roast"). The Roast is a time-honored Chapter tradition that builds unity by satirically and hyperbolically depicting brothers.

22.     Plaintiffs, along with their fellow prospective Chapter members, devised a set of skits in accordance with tradition. The skits were performed privately at the Chapter's house.

Recognizing that some members may not be able to attend the Roast, the Roast was recorded for private viewing by fellow Chapter members. The recording was intended to be for private use only, and was only accessible to Chapter members.

23.     On or about April 18, 2018, without authorization, recordings of portions of the Roast were taken from the private groups without authorization and were disseminated to the University and others. The first clip was released without authorization on April 18, 2018, and is accessible at: https://youtu.be/rwi4gnJSSZg. The second clip was released without authorization on April 21, 2018, and is accessible at: https://youtu.be/ogDeS_zKUNw. The clips appear to have been taken by accessing the private Chapter Facebook group, playing the original recordings, and recording them with another device. The Roast recordings—two unauthorized, decontextualized clips of the Roast—have become the subject of local and national attention.

24.     John Does #1–#3 are ethnically diverse who shared two relevant traits:  first, they were prospective members of the Chapter; and, second, they participated in the Roast. Plaintiff, JOHN DOE #1, is an African American freshman at the University who was in the process of becoming a Chapter member. Plaintiff, JOHN DOE #2, is a Central American citizen who is a freshman at the University who was in the process of becoming a Chapter member. Plaintiff, JOHN DOE #3, is an Indian American freshman at the University who was in the process of becoming a Chapter member. Plaintiff, JOHN DOE #4, is a Freshman at the University who was in the process of becoming a Chapter member. Plaintiff, JOHN DOE #5, is a Chapter member.

**Plaintiff's Rights**

25.     In its Student Handbook, the University includes "Student Rights and Responsibilities," which includes the right to:

a. "Speech/Expression/Press.  Students have the right to express themselves freely on any subject provided they do so in a manner that does not violate the Code of Student Conduct. Students in turn have the responsibility to respect the right of all members of the University to exercise these freedoms";

b. "Fundamental Fairness.  Students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct—as provided in the published procedures of the University's Conduct System or other official University publications. Students have the right to written notice and the opportunity for a hearing before any change in status is incurred for disciplinary reasons unless a significant threat to persons or property exists"; and

c. "Students have the right to expect a reasonably safe environment supportive of the University mission and their own educational goals. Students have the responsibility to protect and maintain that environment and to protect themselves from all hazards to the extent that reasonable behavior and precaution can avoid risk."

26.     The University at all times herein mentioned established, created, published, and furnished to students on a yearly basis policies and procedures governing the administration of penalties related to the aforementioned rules and regulations. Such policies and procedures were

incorporated in and made a part of the Syracuse University's Student Conduct System Handbook (the "System").

27.     In a portion entitled "Bill of Rights", the System specifically sets forth some of the rights of students at the University. Specifically, regarding the rights of the accused, the "Bill of Rights" states students have the right to:

  a.   Participate in a process that is fair, impartial, and provides adequate notice and meaningful opportunity to be heard;

  b.   Access to at least one level of appeal of a determination; and

  c.   Be accompanied by an advisor of choice who may assist and advise a reporting individual, accused or respondent throughout the judicial or conduct process including during **all meetings related to such process.**

28.     Additionally, Part – 4.1 of the System states that the academic status of students "shall not be changed while a case is pending in the Office of Student Rights and Responsibilities, unless it has been determined by the Director of Student Rights and Responsibilities, in consultation with the Senior Vice President for Enrollment and the Student Experience, or a designee, that an interim suspension is required only after a decision has been made that the interim suspension promotes the safety and well-being of the University community."

29.     Part – 4.2 of the System states that: "A student who is suspended on an interim basis pending the outcome of proceedings against them will be given the opportunity to be heard by the University Appeals Board on the merits of the decision to impose the interim suspension within three (3) University business days of receipt by the Office of Student Rights and Responsibilities of the student's written request for such a hearing. Such a request must be made by the student within 30 University business days of the imposition of the interim suspension. If

no such request is made, the interim suspension will remain in effect pending a hearing or Informal Resolution meeting on the merits of the conduct case. All recommendations of the University Appeals Board reviewing the imposition of an interim suspension are confirmed by the Senior Vice President for Enrollment and the Student Experience or their designee, and when confirmed, the decision is final and no further review of the interim suspension status is available."

**The University's Impulsive and Unfounded Punishment
Without Proper and Appropriate Investigation:
April 18, 2018**

30.     On April 18, 2018, the Roast recordings were released without authorization.

31.     At 11:05am on April 18, 2018, the Director of the Office of Student Rights and Responsibilities, PAMELA PETERS, emailed the Chapter stating it had been "suspended."

32.     Just twenty-nine minutes later, the Chancellor, KENT SYVERUD, sent a campus-wide email identifying the Chapter as the originator of a video containing "extremely troubling and disturbing conduct." After identifying the fraternity, the Chancellor characterized the "words and behaviors" in the Roast recording as "extremely racist, anti-Semitic, homophobic, sexist, and hostile to people with disabilities."

33.     At approximately 4:30pm on April 18, 2018, the Dean of the College of Engineering and Computer Science, TERESA ABI-NADER DAHLBERG, sent an email stating, "the Syracuse University campus was shown very ugly, disturbing behavior displayed by some of our students" insofar as "[a] series of videos was uncovered that showed some members of the Theta Tau professional engineering fraternity using racist, anti-Semitic, homophobic, sexist, and ableist language."

**The University's Continued Disparagement Without a Meaningful Investigation:**
**April 19, 2018 to April 23, 2018**

34.    Over the ensuing seven days, the University has followed the pattern it established on April 18, 2018: labelling Plaintiffs as racist, anti-Semitic, homophobic, sexist, and hostile to people with disabilities to feign action and attention instead of investigating the allegations and explaining the actual, satirical meaning of the Roast.

35.    The Roast recordings, published by *The Daily Orange* and commented on by multiple University officials between April 19, 2018 and April 23, 2018, have been repeatedly decontextualized, intentionally distorted, and maligned to Plaintiff's detriment in favor of the University's public relations response campaign.  Instead of portraying the Roast in its satirical intent, University officials have selectively commented on snippets to make the Roast appear as though the excerpts were seriously held views of the participants.  University officials have made numerous false statements of fact over the last eight days:

    a.  Chancellor Kent Syverud claimed the Roast recordings exhibited "extreme and egregious racism, sexism, ableism, antisemitism and homophobia," completely ignoring the context of the Roast recordings and the Theta Tau members' repeated explanations that, when taken in context, the Roast recordings were satirical;

    b.  Dean of Students Robert Hradsky stated the video depicted "sexual and relationship violence" when it parodies sexual acts that, by any viewing of the recording, may be offensive but are not compelled;

    c.  Chancellor Kent Syverud reaffirmed his earlier misstatements, labelling the videos "[e]xplicitly racist, anti-sematic, homophobic, sexist, and hostile to people with disabilities," again ignoring the context of the Roast; and

Case 5:18-cv-00496-FJS-DEP   Document 1   Filed 04/24/18   Page 12 of 28

d.  Chancellor Kent Syverud then again stated, "I believe the second video depicts egregious behavior, including sexual assault, violence and discriminatory mockery and hostility toward people with disabilities that is unacceptable and deeply harmful in many ways," without addressing the Roast's context.

36.     Several times, University officials have described the conduct as criminal despite District Attorney William Fitzpatrick stating that there was "nothing" criminal about the videos. In point of fact, District Attorney William Fitzpatrick repeatedly denied that the conduct constituted crimes. Reviewing the videos in context, he drew the reasonable conclusion that the University continues to ignore: while the video may depict "rank stupidity, . . . luckily stupidity is not a crime."

37.     Upon information and belief, the University either did not perform any evaluation or investigation into the context of the Roast recordings or has willfully ignored the context to further its goals.

38.     On or about April 21, 2018 the University sent eighteen students, including all four Plaintiffs, the same letter informing them that a complaint was filed against them by the Department of Public Safety (the "Charging Letters").  The letters—in intentionally vague, conclusory statements—alleged various violations of Syracuse University rules and regulations that were all patently irrelevant to the skits, which formed the basis for the letters. Specifically, it was alleged that Plaintiffs had committed the following offenses in violation of the Code:

    a.  Physical harm or threat of physical harm to any person or persons, including but not limited to: assault, sexual abuse, or other forms of physical abuse;
    b.  Harassment-whether physical, verbal or electronic, oral, written or video-which is beyond the bounds of protected free speech, directed at a specific individual(s), easily construed as "fighting words," or likely to cause an immediate breach of the peace;
    c.  Conduct-whether physical, verbal or electronic, oral, written or video-which threatens the mental health, physical health, or safety of any person

or persons including, but not limited to hazing, drug or alcohol abuse, bullying and other forms of destructive behavior;

d. Illegal use, possession, purchase, distribution, manufacture or sale of alcohol, drugs or controlled substances, or any other violation of the Syracuse University Policy on Alcohol, Other Drugs, and Tobacco;

e. Violation of University policies, rules or regulations that are published in the Student Handbook, or other official University publications or agreements;

f. Office of Fraternity and Sorority Affairs Policy; and

g. Syracuse University Anti-Harassment Policy.

39.     After sending the Charging Letters, the University commenced a public relations campaign aimed at distancing the University from the incident by making public statements decrying the conduct as, amongst other things, racist and ethnically discriminatory.   Key University figures, including Kent Syverud, Pamela Peter, Robert Hradsky, and Teresa Abi-Nader Dahlberg spoke publically about the video in a calculated attempt to malign the Plaintiffs to further the University's agenda.

40.     On or about April 22 and 23, 2018, Plaintiffs were notified that in addition to being charged with the aforementioned misconduct, Plaintiffs were suspended from attending any classes, labs, or academic functions at the University.

41.     While the students were "suspended," the Chief of the Syracuse University Department of Public Safety stated, "[o]ut of an abundance of caution and ongoing concern for our campus community" the students were suspended. His statement made no reference to a threat to the public safety or welfare of any individuals.

42.     The Plaintiffs (and the thirteen similarly situated students) are all under an unauthorized quasi-suspension enacted by the University to skirt its well-established rules and effectively expel the Plaintiffs without proper process.   In the past eight days, in violation or contravention of its procedures, the University has:

a. Placed the students on an unauthorized, improper "suspension" without cause;

b. Mischaracterized the Roast repeatedly, treating it as serious and sincere when, in context, it is obviously satirical;

c. Mislabeled the Plaintiffs, as participants in the Roast (along with all other participants), as racist, anti-sematic, homophobic, sexist, and hostile to people with disabilities in spite of the Roast's satirical context repeatedly; and

d. Allowed Theta Tau and Plaintiffs (amongst others) to be treated abusively, creating a hostile campus tainted by the mischaracterization and mislabeling the University itself created.

## AS AND FOR A FIRST CAUSE OF ACTION
## FOR BREACH OF CONTRACT

43.     Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "42" with the same force and effect as if fully set forth herein.

44.     Plaintiffs were accepted by the University and enrolled therein as students for programs of study which upon completion would lead to the awarding of degrees in the respective fields of each student.

45.     Upon information and belief, at the time of the Roast and the publishing thereof, Plaintiffs were in good academic standing.

46.     Upon the acceptance of Plaintiffs as students at the University, and their continued enrollment as students, defendants formed an contract with each of the Plaintiffs. The terms of this contract provided that in return for Plaintiffs continued payment of tuition, charges, and fees, along with satisfying Plaintiffs' respective courses of study, abiding by the rules, regulations, and requirements set forth in the University's Code, Plaintiffs would obtain a degree in each of their respective fields.

47. The contract between Plaintiffs and the University additionally required the University treat Plaintiffs in good faith and to refrain from acting in any manner which was arbitrary and capricious related to the administration of its rules, regulation, or judiciary system. Specifically, the University agreed that it would substantially comply with its own policies, procedures, and guidelines before taking any action that would negatively harm Plaintiffs.

48. The University established, created, published and furnished to students on a yearly basis rules and regulations outlining the proper conduct of students in the Code. These rules and regulations constituted some of the terms of the contract between Plaintiffs and the University.

49. The University established, created, published and furnished to students on a yearly basis rules and regulations outlining the proper fraternity/sorority conduct of students. The rules and regulations were incorporated in and made a part of the Syracuse University's Office of Fraternity and Sorority Affairs Policy (the "F&S Policy"). These rules and regulations also constituted some of the terms of the contract between Plaintiffs and the University.

50. The University established, created, published and furnished to students on a yearly basis rules and regulations outlining the proper conduct of students related to harassment. Such rules and regulations were incorporated in and made a part of the Syracuse University's Anti-Harassment Policy. These rules and regulations also constituted some of the terms of the implied contract between Plaintiffs and the University.

51. The University established, created, published, and furnished to students on a yearly basis policies and procedures laid out in the System, which governed the administration of penalties related to the aforementioned rules and regulations. These policies and procedures also constituted some of the terms of the contract between Plaintiffs and the University.

52.    Defendants disregarded Plaintiffs' "Student Rights" as provided for in the Student Handbook, by:

    a.    Violating Plaintiffs' right to express themselves freely and, instead, punishing Plaintiffs for exercising their right to free speech and satire;

    b.    Denying Plaintiffs fundamental fairness in the disciplinary process by failing to impartially investigate claims and follow the University's disciplinary procedures; and

    c.    Failing to protect Plaintiffs by failing to take steps to reasonably protect their identities or curb a threatening atmosphere fostered by the University Officials' statements.

53.    Defendants denied Plaintiffs the rights contained in the University's "Bill of Rights" by:

    a.    Providing misleading documents alleging patently inapplicable violations of the Code of Conduct, thus denying Plaintiffs adequate notice of the charges against them;

    b.    Prejudging and publically proclaiming Plaintiffs racist, anti-sematic, homophobic, sexist, and hostile to people with disabilities, denying Plaintiffs meaningful opportunity to be heard; and

    c.    Denying Plaintiffs the right to be accompanied by an advisor of the Plaintiffs' choice to assist and advise then during all meetings related to such process, including but not limited to the informal meetings that are taking place this week.

54.    On or about April 21, 2018, Plaintiffs were informed that they had been "suspended." In violation of Part 4.1 of the System, which only permits Defendants to change Plaintiffs' academic status to an "interim suspension" while a disciplinary action is pending,

55.    Defendants told Plaintiffs they were suspended as a result of the pending disciplinary proceeding.  At the same time, Defendants specifically denied that Plaintiffs were subject to an "interim suspension."  Upon information and belief, even if Defendants attempted to give interim suspensions to Plaintiffs, Defendants did not have cause to institute an interim suspension based upon the complaint filed with the Syracuse University Department of Public Safety.  As a result, Defendants improperly suspended Plaintiffs in breach of their contract.

56.    The practical effect of Defendants' improper suspension of Plaintiffs is to deny Plaintiffs the right to appeal the suspension decision in accordance with Part 4.2, which only allows appeals of interim suspension determinations further denying the fundamental fairness guaranteed to students under the University's policies.

57.    On or about April 21, 2018, Plaintiffs (and 14 other member of Theta Tau fraternity) received identical Charging Letters from the University.  The Charging Letters were farcical, alleging feigned violations of the Code of Conduct that were patently inapplicable based on the Roast's content. Specifically, the University alleged that Plaintiffs had committed the following patently inapplicable offenses none of which hold water and none of which are true:

   a.  Causing physical harm;
   b.  Harassment;
   c.  Conduct threatening the mental health, physical health, or safety of any person or persons;
   d.  Illegal use or possession of drugs or alcohol; and
   e.  Violation of University, Office of Fraternity and Sorority Affairs, and Anti-Harassment Policies.

58.     In communications following the charging letter, the University has affirmatively denied that Plaintiffs are suspended on an interim basis as defined by the System. Instead, the University has created a specific, arbitrary, and capricious punishment established by administrative fiat for the purposes of bowing to public pressure all-the-while denying Plaintiffs their contractual rights to avail themselves to the judicial proceedings set forth in the System.

59.     Such a suspension has prevented Plaintiffs from attending class, participating in any and all academic activities, and generally fulfilling the requirements to continue the academic year, without following the proper policies and procedures enacted by the University.

60.     This suspension is occurring at a critical time for Plaintiffs as the 2017-2018 academic calendar reflects that Plaintiffs' indefinite and undefined suspension has occurred during the final two weeks of classes and may continue into the final exam period.

61.     Upon information and belief, the University, despite promising otherwise, has not taken any steps to accommodate Plaintiffs and ensure that the students will be permitted to continue their academic studies or finish the school year.

62.     Accordingly, the actions undertaken by the University and set forth above constitute a breach of contract with Plaintiffs and have delayed and impeded their ability to obtain their respective degrees.

63.     The University's actions in suspending Plaintiffs without cause has resulted in the immediate, irreparable injury that has no adequate remedy at law because Plaintiffs will not be able to recover the loss of the time invested in the semester or recover from the stigma of being suspended by the University.  Further, Plaintiffs suffer great hardship in not being able to complete a semester that they worked for months to complete.

## AS AND FOR A SECOND CAUSE OF ACTION
## FOR VIOLATING THE IMPLIED DUTY OF GOOD FAITH AND FAIR
## DEALING

64.     Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "63" with the same force and effect as if fully set forth herein.

65.     Implicit in the aforementioned \contract between Plaintiffs and the University is a covenant of good faith and fair dealings clause, which establishes that the University had, and continues to have, a duty to fairly, justly, and impartially adjudicate this matter and follow the policies and procedures set forth in the System. Moreover, the good faith and fair dealings clause establishes that Plaintiffs have a right to continue their studies pending the resolution of the disciplinary process.

66.     The University has breached the duty of good faith and fair dealings by failing to adjudicate this matter in any manner as outlined by the System. In point of fact, the University has, is, and continues to act in a partial, malicious, and unfounded manner by creating a new punishment by administrative fiat.

67.     Specifically, Senior Vice President of Enrollment and the Student Experience Dolan Evanovich at the University has stated when referring to the adjudicative process here that "[the University is] really trying to compress [the adjudicative process's] timeline."

68.     The University's race to punish Plaintiffs for their involvement in the Roast has denied Plaintiffs the right to avail themselves of any adjudicative process as outlined in the System; specifically, the University's conduct does not permit the Plaintiffs to appeal the University's apparent decision that Plaintiffs' presence on campus is a threat to the community, nor does it permit the student to appeal any decision regarding their suspension.

69.     In addition to creating a punishment for the sole purpose of disadvantaging Plaintiffs, the University has wholly failed to provide academic accommodations to ensure that the students are permitted to continue their studies while the adjudicative process works itself out.

70.     Instead, the University has misguidedly punished the students before allowing them due process as provided for in the Student Handbook.

71.     Such conduct has denied Plaintiffs of their ability to adequately partake in the academic requirements to ensure the completion of the semester.

72.     Accordingly, the University has breached the implied covenant of good faith and fair dealing not only failed to provide the students with the adjudicative process outlined in the System, but has also purposefully impeded Plaintiffs ability to continue their academic studies.

73.     The University's actions in suspending Plaintiffs without cause has resulted in the immediate, irreparable injury that has no adequate remedy at law because Plaintiffs will not be able to recover the loss of the time invested in the semester or recover from the stigma of being suspended by the University.  Further, Plaintiffs suffer great hardship in not being able to complete a semester that they worked for months to complete.

### AS AND FOR A THIRD CAUSE OF ACTION
### FOR BREACH OF CONTRACT FOR VIOLATING PLAINTIFFS'
### CONTRACTUALLY PROTECTED FIRST AMENDMENT RIGHTS

74.     Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "73" with the same force and effect as if fully set forth herein.

75.     As stated above, the University alleged Plaintiffs harassed others in violation of the Code.   But, as demonstrated by the clear, unambiguous and plain text reading of the Code, Plaintiffs cannot be found in violation of this provision unless the questioned speech is "beyond

the bounds of protected free speech" or "easily construed as fighting words," which is not the case here.

76.     A fair, objective, and reasonable viewing of the skit clearly demonstrates that Plaintiffs' conduct does not amount to unprotected speech as defined by the First Amendment; specifically, Plaintiffs conduct in the Roast does not constitute "fighting words" by any definition proscribed by the Supreme Court.

77.     Moreover, even if it was conceded that Plaintiffs' satirical Roast did constitute "hate speech," which Plaintiffs emphatically deny, such speech is not "beyond the bounds of free speech."

78.     Despite this clear and unambiguous text of the Code, and Supreme Court jurisprudence demonstrating Plaintiffs' conduct in the Roast does constitute protected speech, the University continues to use Plaintiffs' satirical Roast as pretext to create a punishment not specifically set forth in the system, without any adjudicative finding of fact or appeals process.

79.     Such a pretextual foundation for supporting a punishment created by administrative fiat is in blatant violation of Plaintiffs' contractual rights to exercise their free speech as defined by the Constitution.

80.     Moreover, in addition to infringing on Plaintiffs' contractually protected right to exercise free speech, the University's conduct has prevented Plaintiffs' from attending class, participating in any and all academic activities, and generally fulfilling the requirements to continue the academic year, without following the proper policies and procedures enacted by the University.

81.     This suspension of academic activities has occurred at a critical time for Plaintiffs as the 2017-2018 academic calendar reflects that Plaintiffs' indefinite and undefined suspension has occurred during the final two weeks of classes and may continue into the final exam period.

82.     Upon information and belief, the University has not taken any steps to accommodate Plaintiffs and ensure that the students will be permitted to continue their academic studies or finish the school year.

83.     Accordingly, the actions undertaken by the University and set forth above constitute a breach of contract with Plaintiffs and have infringed on Plaintiffs' First Amendment rights.

84.     The University's actions in suspending Plaintiffs without cause has resulted in the immediate, irreparable injury that has no adequate remedy at law because Plaintiffs will not be able to recover the loss of the time invested in the semester or recover from the stigma of being suspended by the University.  Further, Plaintiffs suffer great hardship in not being able to complete a semester that they worked for months to complete.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS, KENT SYVERUD, PAMELA PETER, ROBERT HRADSKY, AND TERESA ABI-NADER DAHLBERG, FOR DEFAMATION

85.     Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "84" with the same force and effect as if fully set forth herein.

86.     The Defendants, individually or by and through their agents, servants, or employees, knowingly or negligently, published, distributed, and circulated false accusations and statements regarding Plaintiffs and the Roast.

87.     Upon information and belief, officials at the University have intentionally, purposefully, and repeatedly decontextualized, intentionally distorted, and consciously used

selected video clips at their disposal for the purposes of presenting the Roast in a false light in furtherance of the University's public relations campaign.

88.     Indeed, the University has purposefully and intentionally failed to portray the Roast in the satirical light in which it was intended; instead, University officials have selectively commented on snippets to make the Roast appear as though the excerpts were seriously held views of Plaintiffs.

89.     Specifically, University officials have made several false statements of fact over the last eight days:

    a.  Chancellor Kent Syverud ignored the context of the Roast recordings, falsely labelling the recordings as actual "extreme and egregious racism, sexism, ableism, antisemitism and homophobia";

    b.  Dean of Students Robert Hradsky falsely stated the Roast recordings portrayed "sexual and relationship violence";

    c.  Chancellor Kent Syverud labelled the participants "[e]xplicitly racist, anti-sematic, homophobic, sexist, and hostile to people with disabilities"; and

    d.  Chancellor Kent Syverud erroneously stated, "the second video depicts egregious behavior, including sexual assault, violence and discriminatory mockery and hostility toward people with disabilities that is unacceptable and deeply harmful in many ways," without addressing the Roast's context.

90.     Moreover, University officials, including but not limited to the Department of Public Safety Chief Bobby Maldonado, described the conduct as criminal despite District Attorney William Fitzpatrick stating that there was "nothing" criminal about the videos.

91.    University officials continued to make such statements despite members of the Chapter publically and unequivocally stating that the Roast was a satirical depiction of "an uneducated, racist, homophobic, misogynist, sexist, ableist and intolerant person."

92.    This statement demonstrably shows Plaintiffs were not, in fact, depicting their own views. This statement, along with the other videos not released by the University, demonstrates Plaintiffs goals were to make fun of racists, sexists, and bigots, as opposed to the Universities statements, which indicate Plaintiffs, condone such views.

93.    Accordingly, the Universities statements regarding Plaintiffs is a rash attempt to stigmatize Plaintiffs themselves as racists, sexists, homophobic, sexual assault loving bigots, rather than explaining the true purpose of the video, which was to decry that very behavior.

94.    As a direct and proximate result of the University's intentional and malicious actions, by and through its agents, servants and/or employees, has disseminated libelous, slanderous, and defamatory statements regarding Plaintiffs' alleged beliefs and conduct. As such, Plaintiffs have suffered economic damages, past and future mental anguish and distress, irreparable damage to their reputation, and humiliation, resulting in direct and consequential damages totaling over $1,000,000.00 per Plaintiff.

## AS AND FOR A FIFTH CAUSE OF ACTION AGAINST SYRACUSE UNIVERSITY FOR VIOLATING PLAINTIFFS' FOURTEENTH AMENDMENT RIGHTS PURSUANT TO 42 U.S.C. § 1983

95.    Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "94" with the same force and effect as if fully set forth herein.

96.    The University charged Plaintiffs with violating the following Code provision: "Conduct-whether physical, verbal or electronic, oral, written or video- which threatens the mental

health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying and other forms of destructive behavior."

97.     The University created and imposed a new punishment on Plaintiffs: a quasi-suspension. The quasi-suspension falls outside all procedural safeguards established in the System and was established and implemented arbitrarily, capriciously and unreasonably manner.

98.     The quasi-suspension thus violates Plaintiffs' due process rights as enshrined by the Fourteenth Amendment. Indeed, Plaintiffs are undergoing the quasi-suspension due to the whims of a University administrator without any recourse to appeal their tyrannical rule.

99.     Upon information and belief, and at all relevant times, the University and the Board of Trustees had been compelled by New York Education Law § 6430 to add the Code provision, because New York Education Law § 6430 imposed on universities and colleges across the State of New York with the obligation to enact policies and procedures to "prohibit, among other things, any action or situation which recklessly or intentionally endangers mental or physical health or involves the forced consumption of liquor or drugs for the purpose of initiation into or affiliation with any organization."

100.     Upon information and belief, such inducement was the driving force behind the University adopting the aforementioned policy that specifically addresses the mental and physical health of students as well as the prohibition on compulsory drinking and hazing.

101.     Additionally, Plaintiffs have been denied the right to procedural due process by virtue of the University denying them the right to a procedural advisor at all phases of the disciplinary process, as promised in the Student Handbook and Student Bill of Rights, which deprives them of a meaningful opportunity to be heard.

102.    Therefore, the University was acting under the color of a State statute when it enacted the aforementioned policy.

103.    Moreover, because the University's actions were significantly encouraged, either overtly or covertly, the University's otherwise private actions are chargeable to the State.

104.    Accordingly, the University's conduct is fairly attributable to the State, because the State, upon information and belief, substantially encouraged the University's disciplinary action taken against Plaintiffs.

105.    The University's actions in suspending Plaintiffs without cause has resulted in the immediate, irreparable injury that has no adequate remedy at law because Plaintiffs will not be able to recover the loss of the time invested in the semester or recover from the stigma of being suspended by the University.  Further, Plaintiffs suffer great hardship in not being able to complete a semester that they worked for months to complete.

## AS AND FOR A SIXTH CAUSE OF ACTION
## FOR PUNITIVE DAMAGES

106.    Plaintiffs repeat and reallege each and every allegation in paragraphs "1" through "105" as if specifically set forth below.

107.    Defendants' aforementioned acts demonstrate a callous, reckless, willful, depraved and wanton indifference to and disregard for Plaintiffs' rights.

108.    Defendants' grossly negligent, willful, and wanton conduct evinces a total, conscious and/or reckless disregard of Plaintiffs' contractual and constitutional rights to the due process and freedom of speech.

109.    Defendants' unauthorized and unlawful actions, despite full knowledge of the consequences associated with those actions demonstrates a callous, reckless, willful, depraved and wanton indifference to and disregard for Plaintiffs' rights and of federal law.

110.    Consequently, an award of punitive damages is warranted and required in order to uphold and vindicate Plaintiffs' rights.

111.    By reason of the foregoing, Plaintiffs seek judgment against Defendants for compensatory and punitive damages in an amount that exceeds the jurisdictional limits of all lower courts, together with interest, disbursements, costs and fees, in addition to attorneys' fees, to the fullest extent permitted by law.

**WHEREFORE**, Plaintiffs, JOHN DOE #1, JOHN DOE #2, JOHN DOE #3, and JOHN DOE #4, and JOHN DOE #5, respectfully request the following relief be granted by this Court:

A. A permanent injunction:

    a. Restoring Plaintiffs to good academic standing during the pendency of this Action;

    b. Staying any pending disciplinary proceedings taken by Defendants against Plaintiffs during the pendency of this Action;

    c. Prohibiting Defendants from furthering any disciplinary actions already taken against Plaintiffs during the pendency of this Action; and

    d. Prohibiting Defendants from commencing any other disciplinary actions against Plaintiffs during the pendency of this Action;

B. A judgment against all Defendants, jointly and severally, awarding compensatory damages to Plaintiffs in an amount to be determined at a jury trial;

C. A judgment against all Defendants, jointly and severally, awarding punitive damages to Plaintiffs in an amount to be determined at a jury trial;

D.  Costs and prejudgment interest; and

E.  Any other such and further relief as the Court deems just and proper.

Dated: April 24, 2018

**SMITH, SOVIK, KENDRICK & SUGNET, P.C.**

By:

Kevin E. Hulslander, Esq.
Bar Roll No.:  103027
Karen Guyder Felter, Esq.
Bar Roll No.:  508182
David M. Katz, Esq.
Bar Roll No.:  700065
*Attorneys for Plaintiffs*
250 South Clinton Street, Suite 600
Syracuse, New York 13202
Telephone:      (315) 474–2911
Facsimile:      (315) 474–6015
Email:            khulslander@smithsovik.com