UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JOHN DOE #1**, **JOHN DOE #2**, **JOHN DOE #3**, **JOHN DOE #4**, **and JOHN DOE #5**,<br><br>    Plaintiffs,<br><br>vs.<br><br>**SYRACUSE UNIVERSITY, KENT SYVERUD**, individually and as Chancellor of Syracuse University, **PAMELA PETER**, individually and as Assistant Dean of Student Rights and Affairs and the Director of the Office of Student Rights and Responsibilities, **ROBERT HRADSKY**, individually and as Syracuse University Dean of Students and Associate Vice President of the Student Experience, and **TERESA ABI-NADER DAHLBERG**, individually and as the Dean of the College of Engineering and Computer Science,<br><br>    Defendants. | Civil Action No. 5:18-CV-00496 (FJS-DEP) |

### DECLARATION OF GABRIEL M. NUGENT

I, GABRIEL M. NUGENT, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I am the Deputy General Counsel of Syracuse University (the "University").

2. I have personal knowledge of the facts stated herein.

3. Between April 18 and 21, 2018, the University's independent student newspaper, *The Daily Orange*, posted online two video recordings of certain members of the University's chapter of the *Theta Tau* fraternity.

4. In the videos, which continue to be available online, the fraternity members are heard to say "fuck black people!" "fuck spics!," and "I solemnly swear to always have hatred in my heart for niggers, spics, and most importantly the fuckin' kikes." The individuals in the videos

{H3355302.1}

can likewise be seen simulating sex acts on a student playing the role of a developmentally-disabled wheelchair-bound individual who they describe as a "wheelchair retarded Yankee," "brain-dead from being chronically whipped," who is "totally unaware of this light rape that's occurring." Other members of the fraternity can be seen in the videos watching, laughing, and cheering the above-described conduct.

5. After the University received the videos, it began an investigation into whether the students associated with, and depicted in, the videos were in violation of the University's Code of Student Conduct. Violations of the Code of Student Conduct are administered through an established process and set of procedures referred to as the University Student Conduct System. A true and correct copy of the 2017-2018 Student Conduct System Handbook is attached hereto as **Exhibit "A."**

6. In general, the procedural process for administering student discipline proceedings occurs in phases, which can be described generally and sequentially as follows:

    a.    <u>Step 1</u>:  a complaint of misconduct is made;

    b.    <u>Step 2</u>:  an investigation is conducted, if necessary;

    c.    <u>Step 3</u>:  formal notice is provided to the accused student of the charges;

    d.    <u>Step 4</u>:  an "informal resolution meeting" is conducted;

    e.    <u>Step 5</u>:  a University Conduct Board formal hearing is conducted; and

    f.    <u>Step 6</u>:  an Appeal to the University Appeal Board is permitted.

7. As set forth more fully below, each of these steps were completed by the University with each of the Doe Plaintiffs. Each had access to a procedural advisor (and most had legal counsel) to provide advice, and each Plaintiff had numerous opportunities to present evidence and argument on their behalf and in their defense, both in the hearing itself and during the appeal

process.

### Application of the Student Conduct System to the *Theta Tau* Misconduct Complaints

8. According to the Student Conduct System procedures (hereinafter the "Conduct Procedures"), for those allegations requiring investigation to determine whether further proceedings are necessary, the University has identified the University's Department of Public Safety ("DPS") as an appropriate agency to investigate alleged misconduct. *See* Ex. A, § 5.4.

9. After the *Theta Tau* videos were released, the University directed DPS to conduct an investigation of the incident. DPS interviewed many of the students associated with, and depicted in, the videos, and collected other information.

10. The University's Conduct Procedures provide that upon DPS determining that a complaint is appropriate, the University's Office of Student Rights and Responsibilities ("OSRR") will contact the student or students involved, provide them notice of the charges being brought against them, and offer them an opportunity to participate in an "informal resolution meeting" with the OSRR case manager to discuss the allegations and potentially resolve the charges via agreement. *See* Ex. "A", § 5.6.

11. Here, on April 21, 2018, following completion of the DPS investigation, the OSRR notified eighteen students associated with the *Theta Tau* videos that they were being charged with violations of five sections of the Code of Student Conduct. A true and correct copy of one of the charging letters is attached hereto as **Exhibit "B"** (the identity of the recipient has been redacted).

12. As indicated in Exhibit "B," the 18 involved students were put on express notice of the charges against them. Specifically, DPS concluded that there was sufficient evidence that the students had violated sections: § 1 (physical harm or threat of physical harm to any person or persons); § 2 (harassment – whether physical, verbal or electronic, oral, written, or video); § 3

3

(conduct that threatens the mental health, physical health, or safety of any person or persons including hazing, bullying, and other forms of destructive behavior); § 10 (violation of the University's Policy on Alcohol, Other Drugs, and Tobacco); and § 15 (violation of University policies, specifically the Office of Fraternity and Sorority Affairs Policy, and the University's Anti-Harassment Policy). *See* Ex. "B."

13. Consistent with § 5.6 of the Conduct Procedures, the University's initial notice letter also invited the students to attend and participate in an informal resolution meeting before the OSRR on April 24, 2018, and encouraged the students to obtain a procedural advisor (a student, staff, or faculty member at the University) to assist them through the disciplinary process.

14. Most of the 18 students charged in the *Theta Tau* matter opted to participate in the informal resolution meetings, and two of the 18 resolved the complaints against them at this initial stage of the process.

15. On May 3, 2018, following completion of the informal resolution meetings, the University informed the students that the University Conduct Board (the "Board") would convene to adjudicate the charges in the complaint beginning on May 9, 2018. This date was selected by agreement with counsel for the students so that the Board would not interfere with the completion of final examinations.

16. In the May 3 notification, the University also formally notified the students of additional charges being brought against them under auspices of Title IX, alleging that their conduct violated the University's Sexual Harassment, Abuse and Assault Prevention Policy. The University had previously given notice of the additional Title IX charges by e-mail on April 27, 2018.

17. The Board hearing took place on May 9, 10, and 14, 2018.

18. Articles 6 and 9 of the Conduct Procedures set forth the procedural rules governing Board hearings for conduct cases that do not involve a Title IX component. Article 10 of the Conduct Procedures sets forth the procedural rules governing Title IX cases. When a Title IX case arises, the University invokes the procedures in Article 10, regardless of whether the case also involves non-Title IX conduct charges. *See* Ex. "A" at § 10.19 ("The University Conduct Board will render a decision on all Code of Student Conduct violations listed in the complaint.").

19. Article 10 is structured pursuant to federal law and guidance to provide additional procedural rights to students accused of a Title IX-related violation, including allowing such students to hire attorneys as procedural advisors (Ex. "A" at § 10.11), respond to the investigative report in writing prior to a hearing (Ex. "A" at § 10.12), submit expert witness statements (*See* Ex. "A" at §§ 10.10, 10.16), have their cases heard by trained faculty and staff (Ex. "A" at § 10.14), have the hearing transcribed (Ex. "A" at § 10.16), and submit impact statements (Ex. "A" at § 10.18). Thus, Title IX procedures actually implicate more student procedural rights than non-Title IX conduct.

20. Although the formal rules of evidence do not apply under either set of procedures, accused students are permitted to appear before the Board to make an opening statement, present testimony and documentary evidence, hear all the evidence presented against them, have procedural advisors present, and present a closing statement. *See* Ex. "A" at §§ 9.1– 9.7, 10.16.

21. Not only were the *Theta Tau* students provided all the rights set forth in Article 10 of the Conduct Procedures, but they were also afforded the rights set forth in Article 9. All of the students were permitted to offer evidence in their defense, all had present a procedural advisor, and many had an attorney present. All of the accused students were permitted to fully state and argue their position, defenses, and justifications for the conduct for which they were accused. They

were also permitted to pose cross-examination questions through the Board to the DPS investigator who presented information in support of the conduct charges. They were permitted to submit an expert report regarding free speech. And they were permitted to submit impact statements. The Board was also able to, and did, question the students concerning the alleged conduct and their stated positions.

22. Under § 9.9 of the Conduct Procedures, the Board is permitted to deliberate following the conclusion of the hearing, but then must issue a written decision within five business days following the completion of deliberations. *See* Ex. "A", § 9.9. Under § 10.19, Board hearings are complete "when the Board has agreed upon the final written decision." *See* Ex. "A" at § 10.19. If sanctions are determined to be appropriate, Article 11 of the Conduct Procedures sets forth a menu and/or range of disciplinary sanctions that may be applied to any student found in violation of the Code of Student Conduct or related University policy. *See id*. at § 11.1, *et seq*.

23. Here, the Board complied with all appropriate procedures. The Board completed deliberations on June 5, 2018 when they agreed upon the final written versions of the decisions. On that same day, the OSRR issued the decisions, finding the students responsible for some, but not all, of the asserted charges. In terms of the range of punishments issued, the Board placed the students on a status of indefinite suspension for either one or two years (depending on the nature of the student's involvement), after which the students could petition the University to return. The decisions also advised the students of their appeal rights, identified the deadline for such an appeal, and provided a reference to the applicable section of the Conduct Procedures for appeal procedures. Attached A true and correct copy of one of the written decision is attached hereto as **Exhibit "C"** (the identity of the recipient has been redacted).

24. Each one of the disciplinary punishments imposed in the written Board decisions

fell within the range of appropriate sanctions, and within the Board's discretion, set forth in Article 11 of the Conduct Procedures.

25. As stated above, Article 12 of the Conduct Procedures, permits a student to appeal an adverse decision of the Board within three business days after the written decision is made available. *See* Ex. "A", § 12.2.

26. Fourteen of the fifteen students found responsible in the Board decisions availed themselves of that right by filing written appeals on June 8, 2018. The University Appeals Board has not yet issued its decisions. *See* Ex. "A" at § 12.9.

### The University's Voluntary Dismissal of the Title IX Charges

27. As stated above, on April 27, 2018, the University included additional charges against the students under the auspices of Title IX, which included, in particular, conduct falling under the University's Sexual Harassment, Abuse, and Assault Prevention Policy.

28. I have been made aware that the Plaintiffs in this case contend that the decision to add these charges was made by the University with malicious intent, although I am not aware of any evidence being offered to support this assertion.

29. This assertion is untrue.

30. The University will demonstrate that, contrary to the unsupported assertion by Plaintiffs, the University made the determination to add the new Title IX charges in good faith and with an adequate basis to add such charges.

31. On May 24, 2018, Gregory Germain, a University law professor who also serves as a procedural advisor to three of the *Theta Tau* students, filed a complaint with the U.S. Department of Education's Office for Civil Rights ("OCR"), contending, in relevant part, that he did not believe the students' conduct alone sufficed to establish a hostile environment in violation

of Title IX.  The University requested a copy of Mr. Germain's May 2, 2018 letter, but he refused to provide one.

32. On May 15, 2018, Felice Bowen of OCR sent a letter to Mr. Germain dismissing his complaint for procedural reasons, but also setting forth her opinion, based solely on Mr. Germain's characterization of the charges, and presumably without any of the actual evidence, that the University's Title IX charges may not comport with OCR's current interpretation of Title IX, at least with respect to its definition of a hostile environment.

33. I understand that Plaintiffs are contending that Ms. Bowen's letter "forced" the University to withdraw its Title IX charges.  This is not the case.  The OCR letter was addressed to Mr. Germain, and it merely dismissed his complaint.  The letter did not order or direct the University to do anything, and it was not even addressed to the University.

34. Notwithstanding that the University may disagree with Ms. Bowens' opinion, once the University was made aware of OCR's position, it voluntarily decided to withdraw the charges brought under the University's Sexual Harassment, Abuse, and Assault Prevention Policy, before the Conduct Board issued its decisions.

35. Contrary to the suggestion by the Plaintiffs, the voluntary dismissal of the additional Title IX-related charges shows only that the University chose not to proceed under that one theory, which incorporates an external, federal law standard.  Although the University works zealously to apply and enforce the requirements of Title IX in all of its programs, the proper interpretation and reach of Title IX is currently the subject of some debate, at least within current federal enforcement authorities and as revealed by Ms. Bowen's letter to Mr. Germain.  In any event, the University's decision to withdraw the additional Title IX-related charges had no detrimental effect on the conduct procedures. If anything, the original addition of the charges

afforded the students more process than they would have been entitled to under Article 9 alone. Their assertion that they were denied appropriate process as part of the Conduct Proceedings is not supported by the record, as demonstrated by a leader of the fraternity who answered "yes" when on May 14, 2018 the Board asked, "do you feel you've been given the opportunity to offer all the information that's pertinent to your case?". [transcript of May 14, 2018 proceedings at 491/ pg. 15-16 of the PDF].

<u>University Policy of Placing "Holds" on Student Records During Disciplinary Proceedings</u>

36. As set forth more fully in the Declaration prepared by Eric Nestor, it has been the long-standing policy of the University to place a "hold" on the transcripts of all students who are charged with Code of Student Conduct violations. *See* Decl. of Eric Nestor, at ¶¶ 3-10.

37. Contrary to Plaintiffs' assertions, the University's policy in this regard is clearly established and disclosed to students on the University's website, describing it as part of its regular practice. *See id*.

38. Thus, contrary to the assertion of the Plaintiffs, the fact that Plaintiffs were not able to obtain a copy of their current University transcripts while the disciplinary process was pending was consistent with established University policy. Moreover, as Mr. Nestor describes, the "hold" predated the University's decision to bring the additional Title IX-related charges and is not related to those charges. *See id*.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on June 18, 2018.

_____
Gabriel M. Nugent