**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

**JOHN DOE #1, JOHN DOE #2, JOHN DOE #3, JOHN DOE #4, JOHN DOE #5, JOHN DOE #6, JOHN DOE #7, JOHN DOE #8, and JOHN DOE #9,**

**THIRD AMENDED COMPLAINT**
Case No.:        5:18-cv-496 (FJS/DEP)

Plaintiffs,

v.

**JURY TRIAL DEMANDED**

**SYRACUSE UNIVERSITY, KENT SYVERUD, individually and as Chancellor of Syracuse University, ROBERT HRADSKY, individually and as Syracuse University Dean of Students and Associate Vice President of the Student Experience, and TERESA ABI-NADER DAHLBERG, individually and as the Dean of the College of Engineering and Computer Science,**

Defendants.

Plaintiffs, JOHN DOE #1, JOHN DOE #2, JOHN DOE #3, JOHN DOE #4, JOHN DOE #5, JOHN DOE #6, JOHN DOE #7, JOHN DOE #8, and JOHN DOE #9, by and through their attorneys, Smith, Sovik, Kendrick & Sugnet, P.C., complain of Defendants, SYRACUSE UNIVERSITY, KENT SYVERUD, individually and as Chancellor of Syracuse University, ROBERT HRADSKY, individually and as Syracuse University Dean of Students and Associate Vice President of the Student Experience, TERESA ABI-NADER DAHLBERG, individually and as the Dean of the College of Engineering and Computer Science, as follows:

## INTRODUCTION

1.        Plaintiffs submit this Third Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B).

2.      Plaintiffs are suspended students who were prospective and current members of the Syracuse University chapter of Theta Tau, a professional engineering fraternity.  On March 30, 2018, as was Theta Tau tradition, Plaintiffs performed a satirical skit—a roast—of the Theta Tau brothers.  The skit was recorded by a member of the fraternity and made privately available to Syracuse University Theta Tau members in a closed Facebook group.  Over two weeks later, an unauthorized third party observed the video on a Theta Tau member's computer, recorded it, and disseminated it to both Syracuse University officials and *The Daily Orange* without any Theta Tau member's authorization or consent.

3.      Within minutes of the roast recordings leaking, Defendants had effectively concluded the investigation and proclaimed Plaintiffs were guilty of engaging in abhorrent and likely unlawful conduct; Defendants proclaimed the participants as racist, anti-semitic, homophobic, sexist, and hostile to people with disabilities rather than acknowledging that their own investigation showed the performance was satirical.  Indeed, as the Senior Vice President of Enrollment and the Student Experience, Dolan Evanovich, stated regarding the investigation and ensuing disciplinary process: "We are really trying to compress this timeline."  All Defendants overreacted and sped to judgment, then continued perpetuating their misjudgment publically after their investigation revealed the truth.  University officials even labelled the students "criminals."

4.      During the ensuing eight days, Defendants upended Plaintiffs lives by: (1) suspending them from school and barring them from attending classes in the crucial final weeks of the semester, threatening their academic success and survival; and (2) maligning them personally to salvage Syracuse University's reputation at Plaintiffs' expense.

5.      The University engaged in bad faith behavior throughout the disciplinary process, breaching the contract it has with Plaintiffs.  Specifically, the University began the disciplinary

process by filing frivolous Title IX charges to take advantage of specialized Title IX hearing procedures. The University's frivolous Title IX charge allowed the University to place a hold on Plaintiffs to obtain official transcripts during the pendency of the disciplinary proceedings, effectively precluding them from even attempting to pursue their right to transfer institutions. After conducting the disciplinary process under Title IX procedures, the University withdrew the Title IX charges but nevertheless continued to use the Title IX mechanism in violation of its Student Conduct Handbook. The University continued to hold the students' transcripts and then, without notice, improperly placed notations of the disciplinary action on Plaintiffs' academic records while they pursued appeals contrary to the University's Code of Conduct. At the same time, the University intentionally and without cause stalled the University Appeals Board (the "UAB") proceedings by failing to render decisions for over a month and a half. Overall, the University's bad faith conduct precluded Plaintiffs from pursuing their right to transfer, further penalizing them by forcing a de facto suspension on enrollment at almost any institution. Ultimately, the UAB rendered a decision affirming the same errors in the University Conduct Board (the "UCB") decision.

6. In addition to its bad faith behavior, the University conducted the disciplinary process without regard for fundamental fairness, which is a right given to Syracuse University students in multiple Syracuse University disciplinary policies. From "trying" Plaintiffs as a group rather than as fifteen individuals, to denying Plaintiffs the ability to present evidence that would establish defenses to the charges, and many more errors, Syracuse University persistently and pervasively infected the disciplinary proceedings with incurable prejudice in breach of the Student Conduct Procedures, which form a part of the contract between the University and its students.

7.     Plaintiffs now seek monetary damages to compensate them for Defendants' malicious actions, which injured their educational pursuits as well as their personal, educational, and professional reputations.

## THE PARTIES

8.     Plaintiff, JOHN DOE #1, is an individual who is a student at Syracuse University, scheduled to graduate in May 2021, whose permanent domicile is in the State of Massachusetts.

9.     Plaintiff, JOHN DOE #2, is an individual who is a student at Syracuse University, scheduled to graduate in May 2021, who is a Central American citizen with a domicile in John Doe's country of citizenship.

10.     Plaintiff, JOHN DOE #3, is an individual who is a student at Syracuse University, scheduled to graduate in May 2021, whose permanent domicile is in the State of New Jersey.

11.     Plaintiff, JOHN DOE #4, is an individual who is a student at Syracuse University, scheduled to graduate in May 2021, whose permanent domicile is in the State of Colorado.

12.     Plaintiff, JOHN DOE #5, is an individual who is a student at Syracuse University, scheduled to graduate in May 2019, whose permanent domicile is in the State of New Hampshire.

13.     Plaintiff, JOHN DOE #6, is an individual who is a student at Syracuse University, scheduled to graduate in May 2021, whose permanent domicile is in the State of New Jersey.

14.     Plaintiff, JOHN DOE #7, is an individual who is a student at Syracuse University, scheduled to graduate in May 2020, whose permanent domicile is in the State of Massachusetts.

15.     Plaintiff, JOHN DOE #8, is an individual who is a student at Syracuse University, scheduled to graduate in May 2021, whose permanent domicile is in the State of California.

16.     Plaintiff, JOHN DOE #9, is an individual who is a student at Syracuse University, scheduled to graduate in May 2021, whose permanent domicile is in the State of Massachusetts.

17.     Defendant SYRACUSE UNIVERSITY (the "University") is a private university located in Syracuse, New York.  Upon information and belief, the University operates under a state charter that places the institution under a Board of Trustees, the defendant Trustees of Syracuse University.  Overall guidance of Syracuse University lies in the discretion of its forty-six voting member Board of Trustees. The Board of Trustees is entrusted to select the Chancellor, oversee all faculty and senior administrative appointments, monitor the budget, supervise the endowment and protect Syracuse University.

18.     Defendant, KENT SYVERUD, is the Chancellor of the University.  In his official capacity as Chancellor and President of the University, he is its chief executive and the chief administrative officer of the University.

19.     Defendant, ROBERT HRADSKY, the Syracuse University Dean of Students and Associate Vice President of the Student Experience, is intimately involved in student disciplinary matters, including this matter, where she contacted Plaintiffs.

20.     Defendant, TERESA ABI-NADER DAHLBERG, the Dean of the College of Engineering and Computer Science, heads the College of Engineering and Computer Science and has released statements to the public and the university community regarding Plaintiffs.

**JURISDICTION AND VENUE**

21.     The Court has original subject matter jurisdiction based under 28 U.S.C. § 1332.

22.     This Court has subject matter jurisdiction over the claims in this Complaint pursuant to 28 U.S.C. § 1332 as the parties are completely diverse and the amount in controversy exceeds $75,000 exclusive of interest and costs.  The parties' domiciles are as follows:

a.  Plaintiff, JOHN DOE #1, has a permanent domicile in the State of Massachusetts.

b. Plaintiff, JOHN DOE #2, is a foreign national who has a permanent domicile outside the United States of America.

c. Plaintiff, JOHN DOE #3, has a permanent domicile in the State of New Jersey.

d. Plaintiff, JOHN DOE #4, has a permanent domicile in the State of Colorado.

e. Plaintiff, JOHN DOE #5, has a permanent domicile in the State of New Hampshire.

f. Plaintiff, JOHN DOE #6, has a permanent domicile in the State of New Jersey.

g. Plaintiff, JOHN DOE #7, has a permanent domicile in the State of Massachusetts.

h. Plaintiff, JOHN DOE #8, has a permanent domicile in the State of California.

i. Plaintiff, JOHN DOE #9, has a permanent domicile in the State of Massachusetts.

j. Upon information and belief, Defendant, SYRACUSE UNIVERSITY, is a New York State chartered educational corporation. *See* N.Y. L. 1887, ch. 414.

k. Upon information and belief, Defendant, KENT SYVERUD, has a permanent domicile in the State of New York.

l. Upon information and belief, Defendant, ROBERT HRADSKY, has a permanent domicile in the State of New York.

m. Upon information and belief, Defendant, TERESA ABI-NADER DAHLBERG, has a permanent domicile in the State of New York.

23.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(1) and § 1391(b)(2) since all the defendants reside in this judicial district and the events giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL ALLEGATIONS

24.     Theta Tau is the oldest and largest co-educational fraternity devoted to engineers in the country.  Founded in 1904 at University of Minnesota, the fraternity is committed to

fostering its core values in its members.  The fraternity's guiding principle is to foster a culture of fraternal bonds that creates lifelong relationships built on mutual respect and professionalism while also helping members balance social, service, and professional activities.  Theta Tau prides itself on its diverse membership, which helps foster diversity in the engineering profession.   For example, nationwide, two-thirds of Theta Tau members are male and one-third are female as compared to the national average across engineering schools, which is an imbalanced eighty percent male and twenty percent female.

25.   The Tau chapter of the Theta Tau fraternity (the "Chapter") had forty-eight members (the "Members") and had a sixteen-member new recruit cohort (the "Prospective Members") at all times relevant to this action.  Consistent with Theta Tau's national principles, the Chapter includes twenty-eight diverse members, or forty-four percent of its entire membership. In terms of diversity, the Chapter's demographics are two times more diverse than the College of Engineering & Computer Science at the University.  The Chapter includes foreign nationals, African Americans, Asian Americans, Indian Americans, and Central Americans and members of diverse religious backgrounds.  The Chapter is co-educational, and has a history of including both male and female members.

### The March 30, 2018 Roast

26.   On Friday, March 30, 2018, Plaintiffs (and every other prospective Chapter member) took part in a Theta Tau Chapter tradition: a "roast" of the Chapter members (the "Roast"). The Roast is a time-honored Chapter tradition that builds unity by affording new recruits the opportunity to satirize existing fraternity members.

27.   Plaintiffs, along with their fellow prospective Chapter members, devised a set of skits in accordance with tradition.  The skits were performed privately at the Chapter's house.  On

a Friday evening in March 2018, Plaintiffs performed a now-infamous private roast of current fraternity members in the basement of the Chapter house. The annual roast, traditionally referred to as "Pledge Porno," gave license to prospective members/pledges to write and/or act in skits which poked fun at existing members of the fraternity based on their notable reputations, personalities and/or infamous conduct. The stories were traditionally both sexual and non-sexual, but many typically focused on members' dating success or lack thereof and their existing relationships.

28.      Newly inducted pledges of Theta Tau, performed the roast/skits in the basement of the Chapter house for members only. Present were approximately 25–30 existing members and all 16 new members. There were no individuals present who were not existing or new members of the Chapter. One member of the Chapter recorded the proceedings for members who could not attend the roast. The recording was posted in a private Facebook group, which was only accessible to Chapter members.

29.      A pledge who was from South America narrated the performance. He began by speaking in Spanish, his native language, to throw the audience in attendance off and make them think the entire performance would be in Spanish. The inclusion of a narrator was an obvious indication that the performance was a skit or satire and did not represent the actual views of any participant.

30.      In one of the first scenes of the roast, the pledges satirized an existing fraternity brother who was a Donald Trump supporter. The skit, entitled "The Trilogies of Tri Kappa (KKK)," was written and presented to portray a satirical fraternity headed by a racist who was trying to integrate members of his "once great" fraternity to "his newly formed white empire." **_KKK was stated to be the "main enemy" of Theta Tau_**. The brother who was the subject of the

skit, while conservative and Republican was far from a racist.  Nevertheless, he was portrayed as a red neck, "back woods" figure, who forced his pledges to undergo an "anointing" by taking an oath to "always have hate in [his] heart" for "niggers," "spics" and the "fuckin' kikes."

31.     Although he used outrageous and exaggerated language in his portrayal, the new member who performed in the role of the "racist" Republican brother was not a bigot either.  In fact, this new member's closest friend in the fraternity and planned 2018-19 roommate was African American.  Further, the "pledge" who pretended to take the racist oath in the skit was Jewish.  The same Jewish new member who portrayed the pledge swearing to "hate" "kikes," then called two other performers, new members who were portraying Jewish members of Tri Kappa as "fuckin' kikes," and told them to "get in the fuckin' shower."

32.     It was evident to everyone in attendance who knew the individuals involved that the "KKK" skit was exaggerated satire showing the ignorance and absurdity of actual racists.  All members in attendance at the roast laughed at the performance precisely because of its intentional over-the-top absurdity.

33.     Indeed, the Theta Tau Chapter had twenty-eight members with racial, ethnic, and religious minority backgrounds, including Jewish, African American and Hispanic members.  The established actual diversity of the fraternity only added to the farce of portraying any of its members as racist.

34.     In another skit, an existing fraternity brother, who was known to talk incessantly about his girlfriend, was portrayed as "brain dead" and "retarded" as a result of "being chronically whipped" by his controlling girlfriend.  The member referenced in the skit was mocked for constantly talking about how much he loved his girlfriend and intended to move with her to the United Kingdom.  The story depicted the member unable to communicate about anything other

than how much he loved his girlfriend and even unaware that he was being "light rape[d]" as he sat in a wheelchair.

35.     There were several other skits—at least seven—which included offensive language and extensive references to and portrayal of sexual acts.  The opening skit portrayed a member who was known to obsess over his dog who actually lived at the Chapter house to be having a sexual relationship with the dog.  Other stories addressed notable facts about members' past and present dating histories including the inability of some members to meet girls or perform sexually, some members' reputations as "skirt chasers," and references to members *acting* like girls when talking about "relationship" issues.  A few of the skits included references to imaginary homosexual acts and feelings by or between brothers who were known to be close or to spend a lot of time together.

36.     None of these performances involved *actual* racism, anti-Semitism, homophobia, sexism, sexual assault or disrespect for the disabled.  Rather, the entire point of the skits was to create caricatures of existing members and exaggerate for the purpose of entertainment.  Thus, Plaintiffs used the well-publicized image of a typical President Trump supporter to satirize a conservative, Republican brother.  They gave another member a "disability" that does not exist— that is, becoming "chronically whipped" and "brain dead" because of his girlfriend.  Other members were portrayed as being so desperate for relationships, they had sex with dogs or the walls of the fraternity.  The performances were raunchy, offensive and full of rank stupidity. However, no one in attendance did or could have interpreted the skits as anything other than what they were—satirical parodies portraying offensive conduct and attitudes offered for entertainment with no intent to harm or harass anyone.

37.     All prospective members, including Plaintiffs, participated in the Roast.

**The University's Impulsive and Unfounded Punishment**
**Without Proper and Appropriate Investigation:**
**April 18, 2018**

38.     For over two weeks after the roast occurred, no person associated with the Chapter complained about being offended or harmed by the skits and no one outside the Chapter even knew that they had occurred.  On or before April 18, 2018, however, a then unknown but since identified third party viewed the recordings of the roast on a computer or laptop and made a secondary unauthorized recording using a cell phone video application.  This individual then sent the cell phone recordings to the University and *The Daily Orange*.

39.     On or about April 18, 2018, without authorization, recordings of the Roast were disseminated to the University and others.  In all, the entire Roast was captured in nine recorded clips, which were all given to University officials.  But only two of the nine clips were released to the public by *The Daily Orange*.  The first clip was released without authorization on April 18, 2018, and is accessible at: https://youtu.be/rwi4gnJSSZg.  The second clip was released without authorization on April 21, 2018, and is accessible at: https://youtu.be/ogDeS_zKUNw.  The clips appear to have been taken by accessing the private Chapter Facebook group, playing the original recordings, and recording them with another device.  The Roast recordings—two unauthorized, decontextualized clips of the Roast—have become the subject of local and national attention.

40.     In the ensuing hours, the University's high-level administrators initiated an investigation of the video clips which unequivocally confirmed they depicted a satirical roast. Nevertheless, Defendant SYVERUD and other high-ranking administrators labelled the Chapter and Plaintiffs as ***actual*** racists, anti-Semites, homophobes, sexists, and ablists, who had engaged in potentially criminal acts of violence and abuse toward protected classes of the University community.  Exhibit **"A"**.

41.     At 11:05am on April 18, 2018, the Director of the Office of Student Rights and Responsibilities, PAMELA PETERS, emailed the Chapter stating it had been "suspended." Just twenty-nine minutes later, the Chancellor, KENT SYVERUD, sent a campus-wide email identifying the Chapter as the originator of a video containing "extremely troubling and disturbing conduct." After identifying the fraternity, the Chancellor characterized the "words and behaviors" in the Roast recording as "extremely racist, anti-Semitic, homophobic, sexist, and hostile to people with disabilities." Exhibit **"A"**.

42.     At approximately 4:30pm on April 18, 2018, the Dean of the College of Engineering and Computer Science, TERESA ABI-NADER DAHLBERG, sent an email falsely stating that Plaintiffs had engaged in actual racist, anti-Semitic, homophobic, sexist, and ableist conduct: "the Syracuse University campus was shown very ugly, disturbing behavior displayed by some of our students" insofar as "[a] series of videos was uncovered that showed some members of the Theta Tau professional engineering fraternity using racist, anti-Semitic, homophobic, sexist, and ableist language." Exhibit **"A"**.

43.     The resulting public reaction to news stories covering the comments of University administrators led the University, by and through the University supported *Daily Orange*, to edit and release two of the video clips of the roast. The unwarranted release of edited video clips of the roast, together with commentary mischaracterizing the conduct portrayed in the videos, resulted in campus-wide protests, demonstrations and outrage. To quell the foregoing, Respondent initiated entirely unfounded disciplinary proceedings against the Chapter and Petitioners and ultimately suspended both the Chapter and Petitioners.

**The University's Continued Disparagement Without a Meaningful Investigation:**
**April 19, 2018 to April 23, 2018**

44.     Over the ensuing seven days (and until this day), the University followed the pattern it established on April 18, 2018: labelling Plaintiffs as actually racist, anti-Semitic, homophobic, sexist, and hostile to people with disabilities in spite of its ongoing investigation which included review of all nine video clips of the Roast and interviews with fraternity members which confirmed Plaintiffs' satirical intent in making the Roast.

45.     Indeed, Detective Michael Toia and other University detectives conducted interviews of all Plaintiffs and dozens of other members, many of which were recorded without the students' knowledge.  Interviewed members consistently explained that the Roast was a skit, a roast, that the participants consented to performing or viewing the Roast, and that the students had no intent to harass or offend anyone.  Indeed, the members stated the purpose of the skits were to use hyperbole and "shock comedy" to entertain the members, but not to target any member. Numerous interviewed members commented on the fact that the "racist oath" skit was an attempt to mock a member who was a Trump supporter or to mock President Trump himself.

46.     Notwithstanding Defendants' full knowledge of these facts, multiple Syracuse University officials commented on The Roast recordings published by *The Daily Orange* between April 19, 2018 and April 23, 2018.  In their comments, University officials suggested or stated that the video clips depicted harmful, offensive, and even violent or criminal conduct as well as the seriously held views of the participants.  Defendants suggested that the University community had a reason to feel unsafe based on the presence of Theta Tau, and its members, on campus.

47.     University officials made numerous false statements of fact in the first eight days after the videos' public release:[1]

     a.     Chancellor KENT SYVERUD falsely claimed the Roast recordings exhibited actual "extreme and egregious racism, sexism, ableism, antisemitism and homophobia," completely ignoring Theta Tau members' repeated explanations that, when viewed in context, the Roast recordings were merely satirical ***portrayals*** of racists, sexists, or anti-semites on August 18, 19, 20, and 21 (Exhibit **"A"**); and

     b.     Dean of Students ROBERT HRADSKY falsely stated the video depicted actual "sexual and relationship violence" when it parodied sexual acts that, by any objective view may have been offensive, but did not involve actual violence on April 23 (Exhibit **"A"**).

48.     Several times, University officials described the conduct as "criminal" even after Onondaga County District Attorney William Fitzpatrick stated there was "nothing" criminal about the videos.  Reviewing the videos in context, District Attorney Fitzpatrick drew the reasonable conclusion that the University chose to ignore: while the video depicted "rank stupidity, . . . luckily stupidity is not a crime."

49.     On or about April 21, 2018 the University sent eighteen students, including all nine Plaintiffs, the same letter informing them that a complaint was filed against them by the Department of Public Safety (the "Charging Letters").  The Charging Letters alleged various violations of Syracuse University Code of Conduct and policies that were all patently irrelevant to

---

[1] True and accurate copies of the full statements complained of here are attached to this Complaint as Exhibit **"A"**.

the skits. Specifically, the University alleged that Plaintiffs had committed the following offenses in violation of the Code:

    a.  Physical harm or threat of physical harm to any person or persons, including but not limited to *assault, sexual abuse, or other forms of physical abuse* even though there was no evidence anyone was physically threatened or harmed;

    b.  Harassment-whether physical, verbal or electronic, oral, written or video-which is beyond the bounds of protected free speech, *directed at a specific individual(s)*, easily construed as 'fighting words,' or likely to cause an immediate breach of the peace even though the fraternity members and involved participants denied anyone was targeted or harassed by the skits;

    c.  Conduct—whether physical, verbal or electronic, oral, written or video—which *threatens* the mental health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying and other forms of destructive behavior even though no individual complainant claimed to have been threatened or harmed by the videos;

    d.  Illegal use, possession, purchase, distribution, manufacture or sale of alcohol, drugs or controlled substances, or any other violation of the Syracuse University Policy on Alcohol, Other Drugs, and Tobacco even though there was no evidence that alcohol or drugs were present during the skits;

e.  Violation of University policies, rules or regulations that are published in the Student Handbook, or other official University publications or agreements;

f.  Office of Fraternity and Sorority Affairs Policy; and

g.  Syracuse University Anti-Harassment Policy.

50.    The April 21, 2018 letter failed adequately to give notice of the facts giving rise to the charges, stating only "this complaint arises from an incident that occurred during the spring 2018 semester."

51.    After sending the Charging Letters, the University continued its public relations campaign aimed at distancing the University from the incident by decrying the conduct as, amongst other things, racist and ethnically discriminatory.  Key University figures, including Defendants, Kent Syverud, Robert Hradsky, and Teresa Abi-Nader Dahlberg, spoke every few hours or days about the incident, thus fueling safety concerns of students and campus-wide protests in the University community.

52.    To this day, University officials continue to comment on the Theta Tau proceedings to the University community and the public, which keeps the public spotlight on this case.

53.    On or about April 22 and 23, 2018, Plaintiffs were notified that in addition to being charged with the aforementioned misconduct, they were suspended from attending any classes, labs, or academic functions at the University.  While the University claimed this "suspension" was for the safety and wellbeing of the University community, there was no evidence any of the Plaintiffs posed any threat.  Indeed, the University tacitly acknowledged as much by allowing Plaintiffs to remain in University housing, eat in University cafeterias, and remain on campus while being banned from academic resources.

54.     While the students were "suspended," the Chief of the Syracuse University Department of Public Safety stated, "[o]ut of an abundance of caution and ongoing concern for our campus community" the students were suspended. His statement made no reference to a threat to the public safety or welfare of any individuals.

55.     The Plaintiffs (and the similarly situated students) were all placed under an unauthorized quasi-suspension enacted by the University to skirt its well-established rules (Student Conduct Procedures 4.1 and 4.2, amongst other provisions) and effectively expel the Plaintiffs without any process and outside the boundaries of the procedures referenced above.  In the eight days after the videos were released, in violation or contravention of its procedures, the University:

   a.   Placed the students on an unauthorized, improper "suspension";

   b.   Mischaracterized the Roast repeatedly;

   c.   Mislabeled the Plaintiffs as racist, anti-semitic, homophobic, sexist, and hostile to people with disabilities; and

   d.   Allowed Theta Tau and Plaintiffs (amongst others) to be treated abusively, creating a hostile campus.

56.     On April 27, 2018, Petitioners received notice that Respondent had revised the previous charges to include a violation of the University's Policy on Sexual Harassment, Abuse, and Assault Prevention ("Title IX policy").

**The UCB Hearings:**
**May 9, 10, and 14, 2018**

57.     The University's unlawful conduct continued throughout the disciplinary process and, more specifically, continued at the hearings.  During the UCB hearings, Plaintiffs raised a plethora of procedural infirmities and made timely objections to the inclusion or exclusion of evidence.  Plaintiffs' objections were uniformly denied or deferred and not addressed substantively

during the hearing or in the UCB's written decisions.  By way of non-exhaustive illustration, the hearings involved the following procedural infirmities (amongst many others):

    a.  Even though each Plaintiff had an individual role in the skits or fraternity, the University began by announcing that it would charge and prosecute all Plaintiffs (and others involved) in a single group hearing;

    b.  At the group hearing, the UCB was comprised of three non-tenured University employees despite the fact that the University was the complainant, investigator, prosecutor, judge, and jury in the disciplinary proceedings.  The UCB did not allow any meaningful inquiry into the potential bias of the panel members;

    c.  Further, the UCB chair allowed a University-chosen attorney-advisor to puppeteer the proceedings and impermissibly allowed alternate panel members to steer questioning and influence the hearings;

    d.  Eric Nestor, an Office of Student Rights and Responsibilities employee who was administering the process on the University's behalf, improperly—and frequently—consulted with the UCB during the hearings and stayed in the hearing room during breaks when attorney-client conversations were occurring;

    e.  The UCB repeatedly rephrased or refused to ask questions posed by Plaintiffs to Detective Toia, hampering Plaintiffs' ability to develop evidence or even enter evidence against the University's case;

    f.  The UCB refused to hear "procedural" objections that was not based on "new evidence"; and

g.  The UCB refused to allow the Plaintiffs to present rebuttal evidence even after newly discovered evidence came to light, curtailed questioning of key Complainant witnesses, and ultimately prevented Plaintiffs from making a record of objections at the conclusion of the hearing.

58.    The UCB proceedings were infected with countless procedural errors that individually and cumulatively had a detrimental impact on the outcome of the hearing, which were noted on the record during the hearings and in various letters submitted to the UCB.[2]  Those errors, individually and cumulatively, deprived Plaintiffs of a fair, impartial hearing on the merits, a reason for reversal under Code of Student Conduct section 12.3(b).  However, due to University-imposed constraints of Code section 12.2, which limited Plaintiffs' administrative appeals to ten double-spaced pages, Plaintiffs were not able to address the many, varied procedural errors that occurred.

59.    On June 5, 2018, the UCB issued its decisions, finding all Plaintiffs responsible for Code of Conduct violations based on the same flawed rationales discussed below.  Notably, however, the decision noted that the University had inexplicably withdrawn its Title IX claims "during deliberations."  Notwithstanding the withdrawal, University officials continued to operate under Title IX procedures.  Thus, the University maintained it could continue the holds on Plaintiffs' accounts (a right reserved for Title IX cases) until resolution of the disciplinary proceedings, even while Plaintiffs' UAB appeals were pending.  Similarly, although the University's own procedures, which state that the UCB decisions are not immediately effective

---

[2] Plaintiffs are not in possession of the record before the UCB, or the UAB, which hinders their ability to provide a complete description of the many objections and errors that occurred.  Plaintiffs intend to amplify these alleged errors once the disciplinary proceeding records are produced.

pending appeal except in Title IX cases, the University prematurely marked Plaintiffs' transcripts

as a result of the UCB decisions after withdrawing the Title IX charges.

**The UCB Decisions:**
**June 5, 2018**

60.     The UCB issued decisions on June 5, 2018 (the "UCB Decisions") that ignored the

evidence presented at the hearing and declined to consider the context of the satirical Roast.  The

UCB Decisions found Plaintiffs responsible for harassment, conduct threatening the mental or

physical health or safety of others, and violations of University policy in violation of Code of

Conduct sections 2, 3, and 15.  As discussed above, the University withdrew its Title IX charges

during the UCB's deliberations.  Additionally, the UCB Decisions determined that Plaintiffs were

not responsible for violations of the University's drug and alcohol policy and did not cause or

threaten physical harm to others, absolving Plaintiffs of liability under Code of Conduct sections

1 and 10.

61.     The UCB Decisions: (1) failed to recognize that the Roast was protected free speech

under the Code; (2) failed to take into account the time, place, and manner of the Roast, which was

conducted in the Theta Tau house's basement for members only, and, although recorded, was only

posted to a private Facebook group by a Theta Tau member for privately viewing of Theta Tau

members who understood the satirical skits the context of the performances; and (3) failed to

delineate between the conduct (and effects of the conduct) attributable Theta Tau members

(performing the skit and posting it to a private, members-only Facebook group) and the conduct

(and effects of the conduct) attributable to the unauthorized release and dissemination of the

material by others.  Specifically, the UCB reasoned as follows:

        a.   Contrary to the UCB's ruling, the Roast is within the bounds of protected

           free speech.  The Roast—as satire implicating political and social issues—

is core protected speech. The Board specifically found that the speech was a "skit that roasted current members" and that "the actions and language are not representative of the Respondent[s] personal beliefs." For this reason alone, the decision suffers from an error in the interpretation of University policy, rendering it arbitrary and capricious.

b. After specifically stating that the speech was a "skit that roasted current members" and that "the actions and language are not representative of the Respondent[s] personal beliefs," the Board found Plaintiffs responsible for violating section 2, which prohibits "[h]arassment—whether physical, verbal or electronic, oral, written or video—which is beyond the bounds of protected free speech, directed at a specific individual(s), easily construed as 'fighting words,' or likely to cause an immediate breach of the peace." The UCB based its decision on the premise that a person hearing the language in these scenes would become upset, reactive, and responsive to its content, "*breaching the peace of that person's environment*." In reaching this conclusion, the UCB relied on the context of the seven videos which were never released to the public.

c. By ignoring the context of the Roast—which took place in a private Theta Tau residence in the presence of members only—and by failing to acknowledge the consequence of the Theta Tau members' intent to keep the videos private, the UCB improperly determined that the videos were "likely to cause an immediate breach of the peace." The UCB's conclusion was fundamentally flawed for several reasons:

i.   The speech did not cause an immediate breach of the peace. The speech took place during a members-only Theta Tau event in the basement of the Theta Tau house. Everyone in attendance understood the context of the Roast and knew that it was not an incitement to violence. And the UCB did not find that any one in attendance was offended by the speech. It was not until weeks after the skits were performed that anyone outside Theta Tau ever knew about the event. Thus, the effect of the alleged harassing speech could not possibly have been immediate;

ii.  The conduct attributable to Theta Tau members—performing a private "roast" in the private space of the Theta Tau house—cannot be a breach of the peace. As Merriam-Webster, New York law, and Federal law all state, a breach of the peace requires a *public* act that disturbs the *public peace and order* by definition. The UCB specifically found that the event happened "at the Theta Tau house" and not in public;

iii. The University failed to separate the speech (i.e. what was said in the basement of Theta Tau in the presence of Theta Tau members and had no known negative impact) from the unauthorized release of the videos, which was the result of the actions of a third party. The third party's choice to disseminate those videos to The Daily Orange and the University and the voluntary consumption of this media by the public caused widespread offense, but these actions should not have been attributed to Plaintiffs in the absence of evidence they intended public dissemination of the content;

iv.   The UCB's decision is based on the premise that "a person hearing the language in these scenes would become upset, reactive, and responsive to its content, thereby breaching the peace of that person's environment," which is patently wrong.   The UCB could not cite any actual evidence that anyone at the Roast was upset, or became reactive or responsive to the conduct attributable to Plaintiffs.   Indeed, all who were in attendance or participated in the skits knew they were designed to satirize absurd views, including those of racists and sexists.

d.   Further, even if the content of the videos leaked to the public could be attributable to Plaintiffs, the UCB improperly considered seven unreleased videos that were never publically disseminated in considering the harassment charge.   The undisputed evidence presented at the hearing is that only two video clips were made public by *The Daily Orange* and that no one at Theta Tau was offended by the conduct depicted in the videos while it was occurring.

e.   The UCB conclusorily stated that "the conduct in the skits caused others in the community to feel threatened" in violation of Code of Conduct section 3, which prohibits "[c]onduct—whether physical, verbal or electronic, oral, written or video—which threatens the mental health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying or other forms of destructive behavior."   However, the UCB failed to identify any specific person or persons who claimed to "feel threatened" by the videos.   Moreover, the UCB relied on videos that

were never released to the public in deciding "the community" was
threatened.

    i.    The Roast, and the videos of it, do not threaten the mental health or
safety of any individual. The UCB's conclusory statement that "the
conduct in the skits caused others in the community to feel
threatened" is not supported by the evidence or by objective facts.
Indeed, the open forum that the UCB referenced in its decision
shows the alleged "threats" to health and safety problems faced by
the Syracuse University community discussed by the UCB in its
decision are far-reaching and longstanding.

    ii.    The University presented no evidence to establish any community
member's mental health or safety was directly threatened as a result
of conduct committed by Theta Tau members. The UCB took issue
with the *dissemination* roast's videos to the University community,
which is not attributable to Theta Tau members. As a further matter,
when members of the public clicked on the link posted by *The Daily
Orange* and watched the videos, they knew before they started
watching the content based on the widespread news coverage of the
story what they would see.

    iii.    The University, as the Complainant, is not a victim as contemplated
by the Code. Here, the University took the role of Complainant and
never established that its mental health or safety was threatened, or
that it had mental health to be threatened.

iv. While only two clips were made public by *The Daily Orange*, the UCB relied on all nine videos to claim impact on the University community. However, only publically disseminated videos could have had an effect outside the private Theta Tau house.

f. Plaintiffs were found responsible for violating the "sexual abuse and harassment" portion of the Fraternity and Sorority Affairs' Event Management Guidelines and Community Expectations policy. This section, however, only applies to "*[c]hapters*" which are prohibited from tolerating or condoning any form of sexist or sexually abusive behavior on the part of its members." This section has no application to individual students on its face and, in any event, a satirical performance which parodied sexual acts, does not constitute sexual abuse or harassment.

i. None of the pledges were actually members of the fraternity at the time of the roast. For this reason alone, the pledges were not subject to the policy and had no duties under the policy regardless of its content. Consistent with this policy's organizational applicability, the chapter has been punished separately.

ii. Even assuming the policy applied, there was no reason to object to the skits. The skits were neither sexist nor sexually abusive because they were over-the-top, satirical skits about exaggerated qualities of the members. As the UCB found, none of the skits actually involved sexually abusive or sexist behavior; the UCB repeatedly found the acts were only simulated. As to the scene involving the "whipped"

brother, the skit was not only satire, but also a replication of an actual comedian's skit that is posted on YouTube. Plaintiffs voluntarily participated because they understood the context of skits—a satirical roast—and so there was no reason to object to the skits.

g.  All Plaintiffs were found responsible for violating the Syracuse University Anti-Harassment policy, which uses the identical language to the sexual harassment policy, even after the University ultimately concluded was not applicable to this case.  The Anti-Harassment policy is no different than the sexual harassment policy that the University withdrew.  The only difference is that under the sexual harassment policy the harassment has to be because of sex, gender, or sexual orientation whereas the anti-harassment policy covers a broader range of protected classes, including race, religion, and ethnicity.  The generic Anti-Harassment policy still *only applies to conduct directed at protected groups.*  The policy prohibits "unwelcome conduct or speech directed at an individual or group of individuals, based on a Protected Category, which is so severe or pervasive that it unreasonably interferes with an individual's work performance, terms of employment, educational program participation, or it creates an intimidating, hostile, or offensive environment for study, work, or social living."  "To qualify as Harassment under this policy, the speech or conduct must be both viewed by the listener(s) as Harassment, and be objectively severe or pervasive enough that a reasonable person would agree that the speech or conduct

constitutes Harassment." The policy dictates that all the circumstances surrounding the speech, as well as the speakers' intent, must be considered. The policy "is meant to promote free speech." To that end, the policy "is not intended, and may not be applied, to abridge the free speech." The decision focuses on the "horrid content of the video," which it finds objectively and subjectively caused a negative effect on the community and created a hostile work environment; the decision acknowledges that the video was only meant for private consumption but ultimately claims that the intent to keep the video private is irrelevant. The UCB Decisions arbitrarily and capriciously ignored evidence presented during the hearings and misinterpreted the clear provisions of the Code of Conduct in the following ways:

i.   The skits were not directed at any individual or group of individuals.

ii.  The videos are not harassment when viewed objectively and under all the circumstances presented, as the Anti-Harassment policy requires. The UCB failed to account for the satirical nature of the skits in its decisions. Indeed, it was undisputed by the UCB that the skits were intended to be satirical. The videos do not "speak for themselves" as they do not include the context surrounding the performance. Moreover, on their face, the videos show an over-the-top parody, narrated for the purpose of emphasizing the obvious satire. Further, as the UCB found, the views expressed in the videos were not the personal views of the Plaintiffs.

iii.   The University could not logically withdraw the sexual harassment charge and not the harassment charge since the conduct had nothing to do with sex, sexism, or discrimination against protected groups. Further, the policy, by its own terms, could not "be applied to abridge" free speech, which skits indisputably characterized the skits.

iv.   The conduct attributable to Plaintiffs was not unwelcome to its intended audience because the Theta Tau members—the intended audience—were all aware that the satirical skits were a part of the traditional roasting of current members and were not offended.

v.   The listeners who viewed the skits at Theta Tau or through the private Facebook group were all Theta Tau members who, understanding the context of the videos, were not offended and did not view the conduct as harassment. Neither the third party's actions in recording the videos without authorization nor *The Daily Orange*'s actions in publishing the recordings are attributable Plaintiffs.

vi.   Only the two videos released by *The Daily Orange* are even eligible to be considered as a basis for this charge. The undisputed evidence presented at the hearing is that only two clips were made public by *The Daily Orange* and thus those are the only videos that could have had an effect outside the private Theta Tau house.

62.     As a result of the UCB Decisions, Plaintiffs were suspended for between one and two years, the University placed disciplinary notations on Plaintiffs' transcripts, and the UCB instituted onerous conditions on Plaintiffs' ability to resume coursework after the suspension.

63.     Plaintiffs (and others) appealed the UCB Decisions to the UAB in a timely and proper manner.

**The UAB Proceedings:**
**June 8, 2018 to July 26, 2018**

64.     The UAB received Plaintiffs' appeals by 5:00pm on June 8, 2018.

65.     The Complainant declined to offer any written response to Plaintiffs' appeals.

66.     Despite withdrawing the Title IX claim against Plaintiffs, the University refused to provide Plaintiffs a transcript without disciplinary notations during the pendency of their appeals.

67.     Further, for over a month and a half, while transfer deadlines were passing at other institutions, the UAB failed to render a decision.

68.     The UAB finally issued decisions to Plaintiffs (and others) on July 26, 2018 (the "UAB Decisions").

69.     With one exception UAB Decisions sustained the UCB decisions in all respects, finding Plaintiffs responsible for the violations discussed above and overruling all of Plaintiffs' objections to the UAB.  In connection with the appeal of John Doe #1, the only non-pledge member of Theta Tau who was prosecuted, the UAB reduced his punishment from suspension to academic probation.

## AS AND FOR A FIRST CAUSE OF ACTION
## FOR BREACH OF CONTRACT

70.     Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "69" with the same force and effect as if fully set forth herein.  Plaintiffs specifically repeat and reallege each and every University policy referenced above as the basis for this cause of action.

71.     Plaintiffs were accepted by the University and enrolled as students for programs of study which upon completion would lead to the awarding of degrees in the respective fields of each student.

72.     Upon the acceptance of Plaintiffs as students at the University, and their continued enrollment as students, defendants formed a contract with each of the Plaintiffs. The terms of this contract provided that in return for Plaintiffs continued payment of tuition, charges, and fees, along with satisfying Plaintiffs' respective courses of study, abiding by the rules, regulations, and requirements set forth in the University's Code of Conduct, Plaintiffs would obtain a degree in each of their respective fields.

73.     The contract between Plaintiffs and the University additionally required the University to treat Plaintiffs in good faith in accordance with a University-imposed, contractual "fundamental fairness" standard.  This obligation extended to the disciplinary process, and prohibited the University from acting in any manner which was arbitrary and capricious related to the administration of its rules, regulation, or judiciary system. Specifically, the University agreed that it would substantially comply with its own policies, procedures, and guidelines before taking any action that would negatively harm Plaintiffs, including disciplinary proceedings.

74.     The University established, created, published and furnished to students on a yearly basis, policies, rules, and regulations outlining the expectations of the parties to the academic contract.  These expectations were evident in the Statement of Student Rights and Responsibilities,

the Student Bill of Rights, the Student Conduct Procedures, the University's Office of Fraternity and Sorority Affairs Policy (the "F&S Policy"), and the University's Anti-Harassment Policy.

75.     The University established, created, published, and furnished to students on a yearly basis policies and procedures laid out in the Student Conduct System Handbook, which governed the administration of penalties related to the aforementioned rules and regulations. These policies and procedures also constituted some of the terms of the contract between Plaintiffs and the University.

76.     The identical Charging Letters issued by Defendants to Plaintiffs alleged violations of the Code of Conduct that were patently inapplicable to the conduct of the Plaintiffs based on the Roast's intent and satirical subject matter.

77.     The Charging Letters and attendant investigation, prosecution, and punishment of Plaintiffs for meritless Code of Conduct Violations disregarded Plaintiffs' contractually-protected "Student Rights" as provided for in the Student Handbook, by:

  a. Violating Plaintiffs' right to express themselves freely and, instead, punishing Plaintiffs for exercising their right to free speech and satire;

  b. Denying Plaintiffs fundamental fairness in the disciplinary process by failing to impartially investigate claims and decline to prosecute Plaintiffs for conduct that was not prohibited by the Code of Conduct;

  c. Placing Plaintiffs on quasi-suspension without cause or authority and without a hearing, which prevented them from attending classes, taking quizzes, obtaining the benefits of review sessions, and completing homework at the end of the semester;

d.  Denying Plaintiffs fundamental fairness by in the investigation, prosecution, and punishment of Plaintiffs for unwarranted disciplinary charges;

e.  Placing a hold on Plaintiffs' transcripts based on frivolous Title IX charges and continuing to place a hold on Plaintiffs' transcripts after the Title IX charges were dropped;

f.  Placing disciplinary notations on Plaintiffs' transcripts while appeals of non-Title IX-related charges were pending; and

g.  Failing to ensure the mental and physical safety and well-being of Plaintiffs by creating and/or failing to curb the mob mentality that was created on campus fueled by University Officials' unwarranted statements regarding Plaintiffs' status as racists, homophobes, and anti-semites, among other things.

78.  The Charging Letters and attendant investigation, prosecution, and punishment of Plaintiffs for meritless Code of Conduct Violations denied Plaintiffs the contractual rights contained in the University's "Bill of Rights" by:

a.  Charging them with patently inapplicable violations of the Code of Conduct;

b.  Prejudging and publically proclaiming Plaintiffs were violent or even criminal bigots, sexual harassers, and hostile to people with disabilities which damaged Plaintiffs' reputations and caused them to experience extreme mental and emotional distress;

c.  Denying Plaintiffs fundamental fairness by infecting the UCB proceedings with innumerable procedural errors that resulted in prejudice and/or bias;

d. Placing a hold on Plaintiffs' transcripts based on frivolous Title IX charges and continuing to place a hold on Plaintiffs' transcripts after the Title IX charges were dropped which prevented Plaintiffs from transferring to other institutions;

e. Placing disciplinary notations on Plaintiffs' transcripts while appeals of non-Title IX-related charges were pending which premised their guilt on charges that were not yet final; and

f. Denying Plaintiffs the right to advisors to assist them during all meetings related to the disciplinary process which diminished their ability to properly defend themselves from the charges.

79.     In conjunction with receipt of the Charging Letters, Plaintiffs were informed that they were "suspended," even though the University did not following the procedures in Part 4.1 of the Student Conduct Procedures, which governs "interim suspensions" while disciplinary actions are pending.

80.     After suspending Plaintiffs without notice and prohibiting them from attending class or University functions, Defendants specifically denied that Plaintiffs had been placed on an "interim suspension." Defendants' improper "quasi-suspension" of Plaintiffs breached the procedures set forth in the parties' contract, including, but not limited to, Part 4.1.

81.     The practical effect of Defendants' breach of Part 4.1, which resulted in Plaintiffs' improper suspension was to deny Plaintiffs the opportunity to formally appeal the suspension and return to class and other academic activities before the end of the Spring 2018 semester.

82.     Defendants' breach of Part 4.1, which resulted in the unauthorized "quasi-suspensions," prevented Plaintiffs from successfully finishing the academic year. The University's breach of its policies and procedures, including, but not limited to Part 4 of the Student Conduct

System Procedures, and caused significant damages to the students in the form of diminished academic performance.

83.     The University did not take any meaningful steps to adequately accommodate Plaintiffs and failed to ensure the students could meaningfully continue their academic studies, complete examinations and complete examinations or other evaluations under the conditions of their improper suspension, which further caused damages and diminished academic performance.

84.     The University further breached its contract when the UCB rendered decisions, affirmed by the UAB—described above—which punished Plaintiffs for:

   a.   Exercising free speech, which is protected under both section 2 of the Code of Conduct and the University's Anti-Harassment Policy;

   b.   Engaging in satire in a private environment between consenting participants and a consenting audience, which is not damaging to the mental health or safety of others under section 3 of the Code of Conduct, and which is not a violation of the sexual harassment provisions of the F&S policy; and

   c.   Being prospective members who engaged in conduct allegedly violating the F&S policy when the F&S policy only applies to members of a fraternity.

85.     The actions undertaken by the University constituted a breach of contract with Plaintiffs. These breaches of contract have caused a variety of damages, including, but not limited to: impeding Plaintiffs' ability to complete the semester at Syracuse University; delaying Plaintiffs' ability to obtain their degrees at Syracuse University; incurring expenses to appear at the UCB hearings; denying Plaintiffs the ability to enroll at other institutions; causing Plaintiffs to expend money to apply to lower-tiered institutions; causing Plaintiffs to enroll in lower-tiered educational institutions with no (or inferior) engineering programs or offerings; causing Plaintiffs

to incur unnecessary relocation expenses; and causing Plaintiffs to incur legal fees and expenses to hire attorneys to defend against the University's improper actions.

86.     Further, the University's actions have caused Plaintiffs damage in the inability to timely complete their education and resulted in economic damages including the loss of jobs, scholarships, grants, and other financial funding for their education.

**AS AND FOR A SECOND CAUSE OF ACTION
FOR VIOLATING THE IMPLIED DUTY OF
GOOD FAITH AND FAIR DEALING**

87.     Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "86" with the same force and effect as if fully set forth herein.

88.     Implicit in the contract between Plaintiffs and the University is the covenant of good faith and fair dealing, which establishes that the University had, and continues to have, a duty to fairly, justly, and impartially investigate, adjudicate, allow for appeal, and otherwise handle this matter while following the policies and procedures set forth in the Student Conduct Procedures.

89.     Defendants breached the implied covenant of good faith and fair dealing by

a.  Instituting unfounded disciplinary proceedings against Plaintiffs after conducting an investigation revealing that the skit was satirical and performed by prospective members of the Chapter based on university policies that were patently inapplicable to this matter;

b.  Charging Plaintiffs with patently irrelevant violation of the Title IX policy, which had no application to their conduct, for the sole purpose of implementing modified hearing procedures that hindered Plaintiffs' ability to defend themselves during the ensuing disciplinary proceedings;

    c.   Modifying disciplinary proceeding procedures in such a way that made it impossible for Plaintiffs to have a fair, individual hearing by trying Plaintiffs as a group, hindering their ability to make objections, stopping them from asking questions and rephrasing others, and precluding them from providing evidence in support of their claims; and

    d.   Prejudicing the outcome of the disciplinary proceedings by announcing Plaintiffs' punishments before the conduct board even began.  Indeed, as early as April 19, 2018, Defendant SYVERUD stated the disciplinary outcomes for Theta Tau members would include two potential punishments: "suspension and expulsion."[3]

90.    Specifically, as University officials (including Defendant, ROBERT HRADSKY and Daniel J. French, Esq., the University's counsel) have stated, its prosecution of Plaintiffs in this case was is designed to vindicate the "reputation of the University," which is a bad-faith motivation for prosecution.

91.    The University's initial race to punish Plaintiffs for their involvement in the Roast and then "slow walk" of the UCB and the UAB decisions caused Plaintiffs further damages by impeding their ability to seek judicial review and reversal of the baseless disciplinary determinations.  By initially charging Plaintiffs improperly under Title IX and then withdrawing the charges, the University deprived Plaintiffs of their right to obtain unmarked transcripts and obtain a stay from the UCB's decision pending appeal.  The delay in issuing UAB decisions, and

---

[3]    http://dailyorange.com/2018/04/transcript-su-chancellor-kent-syverud-elaborates-theta-tau-investigation/.

the premature marking of transcripts, deprived Plaintiffs of the ability to transfer to other institutions.

92.     Specifically, the University did not permit the Plaintiffs to appeal the University's to alter their status during disciplinary proceedings by placing them under quasi-suspension. The University also failed to provide academic accommodations to ensure that the students were permitted to complete their studies in a satisfactory manner during the disciplinary process, which caused damages to Plaintiffs and shows that the suspension was conducted in bad faith.

93.     The actions undertaken by the University constituted a breach of contract with Plaintiffs. These breaches of contract have caused a variety of damages, including, but not limited to: impeding Plaintiffs' ability to complete the semester at Syracuse University; delaying Plaintiffs' ability to obtain their degrees at Syracuse University; incurring expenses to appear at the UCB hearings; denying Plaintiffs the ability to enroll at other institutions; causing Plaintiffs to expend money to apply to lower-tiered institutions; causing Plaintiffs to enroll in lower-tiered educational institutions with no (or inferior) engineering programs or offerings; causing Plaintiffs to incur unnecessary relocation expenses; and causing Plaintiffs to incur legal fees and expenses to hire attorneys to defend against the University's improper actions.

94.     Further, the University's actions have caused Plaintiffs damage in the inability to timely complete their education and resulted in economic damages including the loss of jobs, scholarships, grants, and other financial funding for their education.

## AS AND FOR A THIRD CAUSE OF ACTION
## FOR BREACH OF CONTRACT FOR VIOLATING PLAINTIFFS'
## CONTRACTUALLY PROTECTED FIRST AMENDMENT RIGHTS

95.     Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "94" with the same force and effect as if fully set forth herein.

96.     As stated above, the University alleged Plaintiffs harassed others in violation of the Code.   But, as demonstrated by the clear, unambiguous and plain text reading of the Code, Plaintiffs cannot be found in violation of this provision unless the questioned speech is "beyond the bounds of protected free speech" or "easily construed as fighting words," which is not the case here.

97.     A fair, objective, and reasonable viewing of the skit clearly demonstrates that Plaintiffs' conduct such speech was not "beyond the bounds of free speech" as defined by the First Amendment; specifically, Plaintiffs conduct in the Roast did not constitute "fighting words" by any definition.

98.     Despite the clear and unambiguous text of the Code, and Supreme Court jurisprudence demonstrating Plaintiffs' conduct in the Roast constitutes protected speech, the University used Plaintiffs' satirical Roast as pretext for punishing conduct not specifically prohibited or addressed in the Code or University policies.

99.     Accordingly, the actions undertaken by the University and set forth above constitute a breach of the implied covenant of good faith and fair dealing under its contract with Plaintiffs and has infringed on Plaintiffs' contractual guaranteed protection in the Defendant University's Bill of Rights, Code of Conduct, and Anti-Harassment policy.

100.    The actions undertaken by the University constituted a breach of contract with Plaintiffs.  These breaches of contract have caused a variety of damages, including, but not limited to: impeding Plaintiffs' ability to complete the semester at Syracuse University; delaying Plaintiffs' ability to obtain their degrees at Syracuse University; incurring expenses to appear at the UCB hearings; denying Plaintiffs the ability to enroll at other institutions; causing Plaintiffs to expend money to apply to lower-tiered institutions; causing Plaintiffs to enroll in lower-tiered

educational institutions with no (or inferior) engineering programs or offerings; causing Plaintiffs to incur unnecessary relocation expenses; and causing Plaintiffs to incur legal fees and expenses to hire attorneys to defend against the University's improper actions.

101.    Further, the University's actions have caused Plaintiffs damage in the inability to timely complete their education and resulted in economic damages including the loss of jobs, scholarships, grants, and other financial funding for their education.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS, KENT SYVERUD, ROBERT HRADSKY, AND TERESA ABI-NADER DAHLBERG, FOR DEFAMATION

102.    Plaintiffs repeat and reallege the allegations set forth in paragraphs "1" through "101" with the same force and effect as if fully set forth herein.

103.    The Defendants, individually or by and through their agents, servants, or employees, knowingly, negligently, or recklessly, published, distributed, and circulated false accusations and statements regarding Plaintiffs as a small group of participants in the Roast who were involved with the Chapter.

104.    Upon information and belief, officials at the University have intentionally, purposefully, and repeatedly decontextualized, intentionally distorted, and consciously used selected video clips at their disposal for the purposes of presenting the Roast, and Plaintiffs' participation in the Roast, in a false light in furtherance of the University's public relations campaign.

105.    Indeed, at the time of each and every statement complained of, the University and the individual Defendants purposefully and intentionally ignored the information available to them through the pending investigation, which confirmed Plaintiffs' satirical intent in making the Roast; instead, Defendants have published statements which characterize or label the skits as constituting

actual racist, sexist, homophobic, anti-semitic, sexually offensive, or violent conduct and/or the sincerely held views of Plaintiffs.

106.   As discussed above, University officials made several false statements of fact following the release of the videos to the public.  A true and accurate copy of each and every statement complained of is attached hereto as Exhibit **"A"**.  Each statement in Exhibit **"A"** identifies the speaker in the statement, its recipients, and contains the entire statement, except the video (the printout of the page where the video can be found is included in Exhibit **"A"**), which speaks for itself and can be viewed at the URL on the printout.  Each and every statement was made via email and then posted as a press release on the University's website, except the video which was distributed to the University community through the website.

107.   As a direct and proximate result of the University's intentional and malicious actions, by and through its agents, servants and/or employees, has disseminated libelous, slanderous, and defamatory statements regarding Plaintiffs' alleged beliefs and conduct. As such, Plaintiffs have suffered economic damages, past and future mental anguish and distress, and humiliation, resulting in direct and consequential damages totaling over $1,000,000.00 per Plaintiff.

## AS AND FOR A FIFTH CAUSE OF ACTION
## FOR PUNITIVE DAMAGES

108.   Plaintiffs repeat and reallege each and every allegation in paragraphs "1" through "107" as if specifically set forth below.

109.   Defendants' aforementioned acts demonstrate a callous, reckless, willful, depraved and wanton indifference to and disregard for Plaintiffs' rights.

110.    Defendants' grossly negligent, willful, and wanton conduct evinces a total, conscious and/or reckless disregard of Plaintiffs' contractual and constitutional rights to the due process and freedom of speech.

111.    Defendants' unauthorized and unlawful actions, despite full knowledge of the consequences associated with those actions demonstrates a callous, reckless, willful, depraved and wanton indifference to and disregard of Plaintiffs' rights and of federal law.

112.    Consequently, an award of punitive damages is warranted and required in order to uphold and vindicate Plaintiffs' rights.

113.    By reason of the foregoing, Plaintiffs seek judgment against Defendants for compensatory and punitive damages, together with interest, disbursements, costs and fees, in addition to attorneys' fees, to the fullest extent permitted by law.

**WHEREFORE**, Plaintiffs, JOHN DOE #1, JOHN DOE #2, JOHN DOE #3, JOHN DOE #4, JOHN DOE #5, JOHN DOE #6, JOHN DOE #7, JOHN DOE #8, and JOHN DOE #9, respectfully request the following relief be granted by this Court:

    A. A judgment against all Defendants, jointly and severally, awarding compensatory damages to Plaintiffs in an amount to be determined at a jury trial;

    B. A judgment against all Defendants, jointly and severally, awarding punitive damages to Plaintiffs in an amount to be determined at a jury trial;

    C. Costs and prejudgment interest; and

    D. Any other such and further relief as the Court deems just and proper.

Dated: August 30, 2018          **SMITH, SOVIK, KENDRICK & SUGNET, P.C.**

By:                                  
Kevin E. Hulslander, Esq.
Bar Roll No.:  103027
Karen Felter, Esq.
Bar Roll No.:  508182
David M. Katz, Esq.
Bar Roll No.:  700065
*Attorneys for Plaintiffs*
250 South Clinton Street, Suite 600
Syracuse, New York 13202
Telephone:    (315) 474–2911
Facsimile:     (315) 474–6015
Email:        khulslander@smithsovik.com