**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JOHN DOE #1, JOHN DOE #3, and JOHN DOE #5,

                                        Plaintiffs,                    5:18-cv-00496 (BKS/ML)

v.

SYRACUSE UNIVERSITY, KENT SYVERUD,
individually and as Chancellor of Syracuse University,
ROBERT HRADSKY, individually and as Syracuse
University Dean of Students and Associate Vice
President of the Student Experience, and TERESA
ABI-NADER DAHLBERG, individually and as the
Dean of the College of Engineering and Computer
Science,

                                        Defendants.

**Appearances:**

*For Plaintiffs:*
Karen G. Felter
Kevin E. Hulslander
David M. Katz
Smith, Sovik, Kendrick & Sugnet, P.C.
250 South Clinton Street, Suite 600
Syracuse, NY 13202

*For Defendants:*
John G. Powers
Hancock Estabrook, LLP
AXA Tower I, Suite 1500
100 Madison Street
Syracuse, NY 13202

David W. DeBruin
Ishan K. Bhabha
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington DC 20001-4412

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

Three John Doe plaintiffs ("Plaintiffs") bring this diversity action against Defendants Syracuse University (the "University"), Kent Syverud, Robert Hradsky, and Teresa Abi-Nader Dahlberg, alleging: (1) two breach of contract claims (First and Third Claims), (2) violations of the implied duty of good faith and fair dealing (Second Claim), and (3) defamation claims (Fourth Claim). (Dkt. No. 60). Presently before the Court is Defendants' motion to dismiss Plaintiffs' Third Amended Complaint.[1] (Dkt. No. 44). The parties have filed responsive papers, (Dkt Nos. 89, 93), and supplemental briefings regarding a related decision in New York state court. (Dkt. Nos. 97, 98, 113–15). The Court heard oral argument on the motion on June 11, 2020. For the reasons set forth below, Defendants' motion is granted in part and denied in part.[2]

---

[1] Defendants moved to dismiss Plaintiffs' Second Amended Complaint. (Dkt. No. 44). While that motion was pending, Plaintiffs submitted their Third Amended Complaint, (Dkt. No. 60), which Defendants moved to strike. (Dkt. No. 72). The Court denied Defendants' motion to strike, rendering the Third Amended Complaint operative. (Dkt. No. 107). "[W]hen a plaintiff properly amends her complaint after a defendant has filed a motion to dismiss that is still pending, the district court has the option of either denying the pending motion as moot or evaluating the motion in light of the facts alleged in the amended complaint." *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303 (2d Cir. 2020). Here, Defendants request that "even if the Court does not strike the Third Amended Complaint as improperly filed . . . it still should consider the pending motion to dismiss as against the claims in that complaint." (Dkt. No. 80, at 1–2). Plaintiffs request that the motion to dismiss "be denied as moot." (Dkt. No. 82, at 2; Dkt. No. 89-2, at 6–7). Given the similarity between the Second and Third Amended Complaints, the Court will evaluate Defendants' motion to dismiss in light of the facts alleged in the Third Amended Complaint.

[2] Defendants previously moved to strike the Third Amended Complaint for procedural reasons and because amending would be futile "given that the amendment does not cure any of the material deficiencies that should lead the Court to dismiss this action with prejudice for failure to state a claim." (Dkt. No. 72, ¶ 16). The Court denied the motion to strike for procedural reasons and reserved judgment on the question of whether the amendment was futile. *Doe #1 v. Syracuse Univ.*, No. 18-cv-00496, 2020 WL 2065864, at *4 n.3, 2020 U.S. Dist. LEXIS 75016, *12 n.3 (N.D.N.Y. Apr. 29, 2020). Given the decision contained herein, the Court now denies the motion to strike for futility as moot.

## II.  FACTS[3]

### A.  The Parties

Plaintiffs "are suspended students who were prospective and current members of the Syracuse University chapter of Theta Tau, a professional engineering fraternity." (Dkt. No. 60, ¶ 2). The Amended Complaint was brought by nine suspended students proceeding under pseudonyms. (Dkt. No. 26). Six of these plaintiffs have since been dismissed from this action by stipulation of the parties. (Dkt. Nos. 100, 104). Thus, three Plaintiffs remain—John Does #1, 3, and 5. Plaintiffs are domiciled in Massachusetts, New Jersey, and New Hampshire, respectively. (Dkt. No. 60, ¶¶ 8, 10, 12).

Defendants are: (1) Syracuse University, "a private university located in Syracuse, New York"; (2) Kent Syverud, the University's Chancellor; (3) Robert Hradsky, the University's Dean of Students and Associate Vice President of the Student Experience; and (4) Theresa Abi-Nader Dahlberg, the University's Dean of the College of Engineering and Computer Science. (*Id.* ¶¶ 17–20). The University is chartered in New York, and Defendants Syverud, Hradsky, and Abi-Nader Dahlberg are all domiciled in New York. (*Id.* ¶¶ 22(j)–(m)).

### B.  The Roast

"Theta Tau is the oldest and largest co-educational fraternity devoted to engineers in the country." (*Id.* ¶ 24). The University's chapter of Theta Tau (the "Chapter") "had forty-eight members" (the "Members") and "a sixteen-member new recruit cohort" (the "Prospective Members") at the time relevant to this action. (*Id.* ¶ 25). The Chapter includes twenty-eight diverse members, including foreign nationals, African Americans, Asian Americans, Indian

---

[3] The facts are drawn from the Third Amended Complaint and its exhibit, (Dkt. Nos. 60, 60-1), and from exhibits attached to Defendants' motion to dismiss. *See infra* Section IV.A. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

Americans, and Central Americans. (*Id.* ¶ 25). The Chapter has a tradition where Prospective Members "roast" Members, which "afford[s] new recruits the opportunity to satirize existing fraternity members" by "writ[ing] and/or act[ing] in skits which poke[] fun at existing members of the fraternity based on their notable reputations, personalities, and/or infamous conduct." (*Id.* ¶¶ 26–27). This roast is "traditionally referred to as 'Pledge Porno.'" (*Id.* ¶ 27). "The stories were traditionally both sexual and non-sexual but many typically focused on members' dating success or lack thereof and their existing relationships." (*Id.*).

On March 30, 2018, "[n]ewly inducted pledges of Theta Tau[] performed the roast/skits in the basement of the Chapter house for members only." (*Id.* ¶¶ 26, 28). There were approximately 25–30 Members and 16 Prospective Members present. (*Id.* ¶ 28). "One member of the Chapter recorded the proceedings for members who could not attend the roast." (*Id.*). This recording was then "posted in a private Facebook group, which was only accessible to Chapter members." (*Id.*).

The roast began by a Prospective Member narrating in Spanish. (*Id.* ¶ 29). "[O]ne of the first scenes," entitled "The Trilogies of Tri Kappa (KKK)," presented "a satirical fraternity headed by a racist who was trying to integrate members of his 'once great' fraternity to 'his newly formed white empire.'" (*Id.* ¶ 30). The narrator described KKK as the "main enemy" of Theta Tau. (*Id.*). This scene "satirized an existing fraternity brother who was a Donald Trump supporter." (*Id.*). In the scene, "he was portrayed as a red neck, 'back woods' figure, who forced his pledges to undergo an 'anointing' by taking an oath to 'always have hate in [his] heart' for 'niggers,' 'spics,' and the 'fuckin' kikes.'" (*Id.*). The Prospective Member who pretended to take the racist oath was Jewish. (*Id.* ¶ 31). After he swore this oath, he called two Prospective Members "portraying Jewish members of Tri Kappa" "'fuckin' kikes,' and told them to 'get in

4

the fuckin' shower.'" (*Id.* ¶ 31). An audience member is heard stating that went "too far."[4] The

Prospective Member who performed the role of the racist was not a bigot. (*Id.*). Plaintiffs allege

that "[i]t was evident to everyone in attendance who knew the individuals involved that the

'KKK skit' was exaggerated satire showing the ignorance and absurdity of actual racists." (*Id.* ¶

32).

In another skit, "an existing fraternity brother, who was known to talk incessantly about

his girlfriend, was portrayed as 'brain dead' and 'retarded' as a result of 'being chronically

whipped' by his controlling girlfriend." (*Id.* ¶ 34). "The story depicted the member unable to

communicate about anything other than how much he loved his girlfriend and even unaware that

he was being 'light rape[d]' as he sat in a wheelchair."[5] (*Id.*). There were "at least seven" other

skits that "included offensive language and extensive references to and portrayal of sexual acts."

(*Id.* ¶ 35). "A few of the skits included references to imaginary homosexual acts and feelings by

or between brothers who were known to be close." (*Id.*). According to Plaintiffs, "[t]he

performances were raunchy, offensive and full of rank stupidity." (*Id.* ¶ 36).

### C.    The University's Response

On or before April 18, 2018, "a then unknown but since identified third party viewed the

recordings of the roast on a computer or laptop and made a secondary unauthorized recording

using a cell phone video application." (*Id.* ¶ 38). The individual "then sent the cell phone

recordings to the University and *The Daily Orange*." (*Id.*). On April 18, 2018, "recordings of the

Roast were disseminated to the University and others." (*Id.* ¶ 39). The roast "was captured in

nine recorded clips, which were all given to University officials." (*Id.*). Only "two of the nine

---

[4] The video is accessible at https://youtu.be/rwi4gnJSSZg. (Dkt. No. 60, ¶ 39).

[5] The video is accessible at https://youtu.be/ogDeS_zKUNw. (Dkt. No. 60, ¶ 39).

clips were released to the public by *The Daily Orange*," the first on April 18 and the second on

April 21, 2018. (*Id.*). These clips became "the subject of local and national attention." (*Id.*).

There were "campus-wide protests, demonstrations, and outrage." (*Id.* ¶ 43).

On April 18, 2018, Chancellor Syverud sent a message to the campus community, stating

that "[e]arlier today, the University learned of extremely troubling and disturbing conduct at one

of our professional fraternity chapters, Theta Tau." (Dkt. No. 60-1, at 2; Dkt. No. 60, ¶ 41). He

stated the videos "include[d] words and behaviors that are extremely racist, anti-semitic,

homophobic, sexist, and hostile to people with disabilities." (Dkt. No. 60-1, at 2). He noted that

the Chapter had been "immediately suspended" and the Department of Public Safety had

"launched a formal investigation to identify individuals involved and to take additional legal and

disciplinary action." (*Id.*). On April 20, Dean Abi-Nader Dahlberg wrote a message to the

University community stating that "[a] series of videos was uncovered that showed some

members of the Theta Tau professional engineering fraternity using racist, anti-Semitic,

homophobic, sexist, and ableist language."[6] (Dkt. No. 60-1, at 12).

"Detective Michael Toia and other University detectives conducted interviews of all

Plaintiffs and dozens of other members." (Dkt. No. 60, ¶ 45). "Interviewed members consistently

explained that the Roast was a skit, a roast, that the participants consented to performing or

viewing the Roast, and that the students had no intent to harass or offend anyone." (*Id.*). Between

April 19 and 23, 2018, "University officials suggested or stated that the video clips depicted

harmful, offensive, and even violent or criminal conduct as well as the seriously held views of

the participants," "[n]otwithstanding Defendants' full knowledge" that the Members and

---

[6] The Third Amended Complaint states that this message was sent at 4:30 p.m. on April 18, 2018. (Dkt. No. 60, ¶ 42). However, Exhibit A attached to the Third Amended Complaint only contains one message from Dean Abi-Nader Dahlberg, and this message is dated April 20, 2018. (Dkt. No. 60-1, at 12–13).

Prospective Members claimed that the skits were satirical. (*Id.* ¶¶ 45–46). Specifically, Chancellor Syverud gave a public address where he stated that the videos were "racist, anti-Semitic, homophobic, sexist, and ableist." (Dkt. No. 60-1, at 4; Dkt. No. 60, ¶ 47(a)). After the second video clip was released, Chancellor Syverud sent a message to the campus community stating that "an additional video" had been released by the Daily Orange, and this video "depicts sexual assault, physical violence and grotesque hostility toward and mockery of people with physical, intellectual, and other disabilities." (Dkt. No. 60-1, at 18). He further stated that "this additional video is part of the evidence Syracuse University received on Wednesday and immediately referred for potential criminal investigation to local law enforcement and for student judicial proceedings . . . We do not reveal evidence in an ongoing potential criminal and judicial investigation." (*Id.*). Chancellor Syverud explained that "[f]or this reason," he had "been constrained in which [he] could say to date." (*Id.*). Plaintiffs allege that Dean Hradsky "falsely stated that the video depicted actual 'sexual and relationship violence.'" (*Id.* ¶ 47(b)).[7]

### D.    The University's Investigation

"On or about April 21, 2018 the University sent eighteen students, including all nine Plaintiffs, the same letter informing them that a complaint was filed against them by the Department of Public Safety" (the "Charging Letters"). (Dkt. No. 60, ¶ 49). The Charging Letters stated that the Department of Public Safety was alleging Plaintiffs violated five sections of the Code of Student Conduct, including:

> 1)  Physical harm or threat of physical harm to any person or persons, including but not limited to: assault, sexual assault, or other forms of physical abuse.

---

[7] Plaintiffs' Exhibit A does not include this statement; the only statement in the record referencing "sexual and relationship violence" is a news article that reports Dean Hradsky said the body that handles Student Code of Conduct violations at the University "is composed of students, faculty, and staff who are chosen through an application process and are trained in areas such as sexual and relationship violence, as well as harassment." (Dkt. No. 44-3, at 7).

2) Harassment—whether physical, verbal or electronic, oral, written or video—which is beyond the bounds of protected free speech, directed at a specific individual(s), easily construed as "fighting words," or likely to cause an immediate breach of the peace.[8]

3) Conduct—whether physical, verbal, or electronic, oral, written or video— which threatens the mental health, physical health, or safety of any person or persons including, but not limited to hazing, drug or alcohol abuse, bullying and other forms of destructive behavior.

10) Illegal use, possession, purchase, distribution, manufacture or sale of alcohol, drugs or controlled substances, or any other violation of the Syracuse University Policy on Alcohol, Other Drugs, and Tobacco.

15) Violation of University policies, rules or regulations that are published in the Student Handbook, or other official University publications or agreements.
- Office of Fraternity and Sorority Affairs Policy
- Syracuse University Anti-Harassment Policy

(Dkt. No. 44-4, at 2; Dkt. No. 60, ¶ 49). The letter stated that "this complaint arises from an incident that occurred during the spring 2018 semester." (Dkt. No. 44-4, at 2; Dkt. No. 60, ¶ 50).

On or about April 22 and 23, 2018, Plaintiffs were notified that "they were suspended from attending any classes, labs, or academic functions at the University." (Dkt. No. 60, ¶ 53). The University "claimed this 'suspension' was for the safety and wellbeing of the University community." (*Id.*). However, Plaintiffs were allowed to "remain in University housing, eat in University cafeterias, and remain on campus while being banned from academic resources." (*Id.*). Defendants "specifically denied that Plaintiffs had been placed on an 'interim suspension'"

---

[8] The Third Amended Complaint, the Charging Letter submitted by Defendants, and the University's Student Conduct System Handbook (the "Student Handbook") state that the wording of this provision includes the word "or" between "fighting words" and "likely to cause an immediate breach of the peace." (Dkt. No. 60, ¶ 49(b); Dkt. No. 44-4, at 2; Dkt. No. 44-5, at 6). In Plaintiffs' opposition to the motion to dismiss, they assert that Syracuse University Student Handbook provides that this provision is only violated when words can be construed as "fighting words" *and* "likely to cause an immediate breach of the peace." (Dkt. No. 89-2, at 17 n.4). The exact wording of this provision is not relevant to the disposition of the current motion given the state court's ruling, as discussed *infra* Section IV.B.

(*Id.* ¶ 80). Because Defendants did not follow the Student Conduct Procedures for an interim

suspension, Plaintiffs were denied "the opportunity to formally appeal the suspension and return

to class and other academic activities before the end of the Spring 2018 semester." (*Id.* ¶¶ 80–

81). On April 27, 2018, Plaintiffs received notice that the University "had revised the previous

charges to include a violation of the University's Policy on Sexual Harassment, Abuse, and

Assault Prevention" ("Title IX policy"). (*Id.* ¶ 56).

###        E.        The Hearings and the University Conduct Board's Decision

The University Conduct Board ("UCB") conducted hearings on May 9, 10, and 14, 2018.

(Dkt. No. 44-6, at 2). The UCB was comprised of "three non-tenured University employees."

(Dkt. No. 60, ¶ 57(b)). Plaintiffs allege that the hearings involved numerous "procedural

infirmities," including that there was a "single group hearing" despite the fact that "each Plaintiff

had an individual role in the skits," "the UCB did not allow any meaningful inquiry into the

potential bias of the panel members," and "the UCB repeatedly rephrased or refused to ask

questions posed by Plaintiffs to Detective Toia." (*Id.* ¶ 57).

On June 5, 2018, "the UCB issued its decisions, finding all Plaintiffs responsible for

Code of Conduct violations" ("the UCB Decision"). (Dkt. No. 60, ¶ 59). The UCB concluded

that Plaintiffs had violated Code of Conduct sections 2, 3, and 15. (*Id.* ¶ 60; Dkt. No. 44-6).

Regarding the section 15 violations, the UCB determined that all Plaintiffs violated both "the

Office of Fraternity and Sorority Affairs Policy" and "the University's Anti-Harassment Policy."

(Dkt. No. 44-6, at 13; Dkt. No. 60, ¶ 61(f), (g)). The UCB determined that Plaintiffs did not

violate Code of Conduct sections 1 and 10. (Dkt. No. 60, ¶ 60; Dkt. No. 44-6). "[T]he University

withdrew its Title IX charges during the UCB's deliberations," so the UCB did not reach a

finding on whether Plaintiffs violated Title IX. (Dkt. No. 60, ¶ 60). "As a result of the UCB

Decision, Plaintiffs were suspended for between one and two years, the University placed

disciplinary notations on Plaintiffs' transcripts, and the UCB instituted onerous conditions on Plaintiffs' ability to resume coursework after the suspension." (*Id.* ¶ 62).

F.    **The University Appeals Board Proceedings**

Plaintiffs appealed the UCB Decision to the University Appeals Board (the "UAB") on June 8, 2018. (*Id.* ¶¶ 63–64). "Despite withdrawing the Title IX claims against Plaintiffs, the University refused to provide Plaintiffs a transcript without disciplinary notations during the pendency of their appeals." (*Id.* ¶ 66). The UAB issued a decision on July 26, 2018, sustaining the "UCB decision in all respects" with the exception of John Doe #1, the only non-pledge member of Theta Tau who was charged. (*Id.* ¶ 69). "[T]he UAB reduced his punishment from suspension to academic probation" (the "UAB Decision"). (*Id.*).

G.    **Relevant University Policies**

1.    **Syracuse University Statement of Student Rights and Responsibilities**

The University's Student Conduct System Handbook (the "Student Handbook") contains a section called the "Statement of Student Rights and Responsibilities," which states that "[a]s members of the University community, students can reasonably expect that all members of the University community will respect the following rights," including:

> **1. SPEECH/EXPRESSION/PRESS**
> Students have the right to express themselves freely on any subject provided they do so in a manner that does not violate the Code of Student Conduct. Students in turn have the responsibility to respect the right of all members of the University to exercise these freedoms.
>
> **9. FUNDAMENTAL FAIRNESS**
> Students have the right to written notice and the opportunity for a hearing before any change in status is incurred for disciplinary reasons unless a significant threat to persons or property exists. Students have the right to fundamental fairness before formal disciplinary sanctions are imposed by the University for violations of the Code of Student Conduct—as provided in the published

procedures of the University's Student Conduct System or other official University publications.

(Dkt. No. 44-5, at 5).

### 2. The Student Handbook—Part 4. Interim Suspension, No Contact Orders and Other Administrative Actions

Part 4.1 of the Student Handbook states:

> The status of a respondent will not be changed while a case is pending, unless the Director of Student Rights and Responsibilities, in consultation with the Senior Vice President for Enrollment and the Student Experience, or a designee, determines that an interim suspension is required to promote the safety and well-being of the University community.

(*Id.* at 10). Part 4.2 of the Student Handbook states in relevant part:

> A student who is suspended on an interim basis pending the outcome of proceedings against them will be given the opportunity to be heard by the University Appeals Board on the merits of the decision to impose the interim suspension within three (3) University business days of receipt by the Office of Student Rights and Responsibilities of the student's written request for such a hearing.

(*Id.*).

### 3. The Student Handbook—Part 13. Modification of Procedures

Part 13 of the Student Handbook states:

> Syracuse University reserves the right to modify its conduct procedures and appeals processes with written notice to the complainant and the respondent . . . when safety and security issues so demand . . . Modified procedures, nonetheless, will provide student with required elements of fundamental fairness.

(*Id.* at 25).

### 4. Office of Fraternity and Sorority Affairs Policy

The University's Office of Fraternity and Sorority Affairs Policy's "Sexual Abuse and Harassment" section states:

> Chapters will not tolerate or condone any form of sexist or sexually abusive behaviors on the part of its members, whether physical, mental or emotional. This is to include any actions, activities or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together. The employment or use of strippers, exotic dancers or similar, whether professional or amateur, at a fraternity event as defined in this policy, is prohibited.

(Dkt. No. 44-8, at 4).

### H.   Article 78 Proceeding

Plaintiffs filed this action on April 24, 2018, shortly after receiving the Charging Letters and prior to the UCB and UAB Decisions. (Dkt. No. 1). On August 13, 2018—after the disciplinary proceedings against Plaintiffs concluded—a related action was filed in New York Supreme Court (the "Article 78 Proceeding"). (Dkt. No. 97-2, at 1). The plaintiffs there (the "State Court Petitioners") filed a Civil Practice Law and Rules Article 78 petition, seeking annulment of the University's disciplinary sanctions. (*Id.*). In the Article 78 Proceeding, the State Court Petitioners argued that the University "fail[ed] to follow [its] own procedures [during the disciplinary process]. . . [and the State Court Petitioners] did not violate the rules," so their punishment shocks the conscience. (*Id.* at 4). Plaintiff Doe #1 was a party to the Article 78 Proceeding. (Dkt. No. 97, at 4).

On January 7, 2019, Justice James P. McClusky upheld the University's punishment of the State Court Petitioners. (Dkt. No. 97-2, at 7). He found that the University "substantially complied with [its] procedures, including giving notice of the charges." (*Id.* at 4). Justice McClusky struck the University's determination that the State Court Petitioners violated section 2 of the Code of Conduct for harassment, finding no rational basis for this violation because the "record is devoid of any specific individual to whom the speech was directed that was harassed" and the words are protected free speech. (*Id.* at 5-6). He held that the University's determination

that the State Court Petitioners violated Code Sections 3 (conduct threatening "mental health, physical health or safety") and 15 (Office of Fraternity and Sorority Affairs guidelines prohibiting "sexist and or sexually abusive" behavior) was "rational" and "based on some evidence." (*Id.* at 6–7). Because the University's determination that the State Court Petitioners violated "two rules" and their "punishment [is] clearly within the guidelines," the punishment was upheld. (*Id.* at 7).

## III.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When deciding a motion to dismiss, the Court's review is ordinarily limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

IV.    **DISCUSSION**

    A.    **Documents Extraneous to the Complaint**

    Defendants attach several exhibits in support of their motion, including: (1) public statements made by Defendants,[9] (Dkt. No. 44-3), (2) a Charging Letter,[10] (Dkt. No. 44-4), (3) the Student Handbook, (Dkt. No. 44-5), (4) the UCB Decision for one unidentified Plaintiff, (Dkt. No. 44-6), (5) the UAB Decision for one unidentified Plaintiff, (Dkt. No. 44-7), and (6) the Office of Fraternity and Sorority Affairs Policy, (Dkt. No. 44-8). Thus, as a preliminary matter, the Court must decide which exhibits, if any, to consider in resolving this motion. Defendants argue that the Court should consider the Charging Letter, UCB Decision, and UAB Decision because their "terms and effect" were "integral to" the Third Amended Complaint. (Dkt. No. 44-1, at 13). Defendants further contend the Court can consider the public statements and the University's policies because the Third Amended Complaint referenced them and relied on their content. (*Id.* at 14). Plaintiffs do not dispute Defendants' assertion that the Court should consider these exhibits. (*See* Dkt. No. 89-2).

    "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Id.* A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147,

---

[9] The statements submitted by Defendants overlap with the exhibit attached to the Third Amended Complaint, (Dkt. No. 60-1), with the exception of the news story containing Dean Hradsky's statements, as discussed *supra* Section II.C, n.7. (Dkt. No. 44-3, at 6–8).

[10] The Third Amended Complaint alleges that all of the Charging Letters were "identical." (Dkt. No. 60, ¶ 76).

152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted)). Even where a document is deemed "'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (quoting *DiFolco*, 622 F.3d at 111). "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.* (quoting *Faulkner*, 463 F.3d at 134). "This principle is driven by a concern that a plaintiff may lack notice that the material will be considered to resolve factual matters." *Id.* Thus, "if material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (quoting Fed. R. Civ. P. 12(d)).

Throughout the Third Amended Complaint, Plaintiffs repeatedly refer to the documents at issue and sometimes summarize their contents. (*E.g.*, Dkt. No. 60, ¶¶ 41–42, 46–47, 49, 60–62, 68–69, 74–84). Moreover, the Complaint "relies heavily upon [their] terms and effect, thereby rendering the document[s] integral to the complaint." *Nicosia*, 834 F.3d at 230 (quoting *DiFolco*, 622 F.3d at 111). Since Plaintiffs "obviously possessed them and relied on them in drafting" the Complaint, the Court will consider them.[11] *Routh v. Univ. of Rochester*, 981 F. Supp. 2d 184, 191 (W.D.N.Y. 2013).

---

[11] The Court finds the videos for which Plaintiffs provided links in the Third Amended Complaint to be "referenced" therein and will consider them in deciding this motion. *Estate of Roman v. City of Newark*, 914 F.3d 789, 796, 799 (3d Cir. 2019) (considering documents hyperlinked in the complaint).

### B.      Preclusive Effect of the Article 78 Proceeding

Defendants contend that the Court should dismiss Plaintiffs' first three claims—for breach of contract and violation of the implied duty of good faith and fair dealing—"on the ground that those claims are now . . . barred by collateral estoppel" because they are "predicated on the same allegations and contentions" Plaintiff Doe #1[12] raised in the Article 78 Proceeding. (Dkt. No. 97, at 4). Issue preclusion "bars litigation of an issue when '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'" *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013) (quoting *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006)). "The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply issue preclusion," whereas "the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues rests with . . . the party opposing the application of issue preclusion." *Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir. 1996).

Here, based on the UCB and UAB Decisions, the University suspended Does #3 and #5 for one to two years and placed Doe #1 on academic probation. (Dkt. No. 60, ¶¶ 62, 69). In the Article 78 Proceeding, Justice McClusky upheld these punishments because he found that the University's determination that the State Court Petitioners violated sections 3 and 15 of the Code

---

[12] Only Doe #1 was a party to the Article 78 Proceeding. However, Defendants argue that because Does #3 and #5 "stand in privity with" the State Court Petitioners, including Doe #1, "their breach of contract claims are also barred." (Dkt. No. 97, at 7). Specifically, Defendants argue that "[g]iven the substantive overlap in the [federal and state court] actions . . . and the single representation of the combined group of *Theta Tau* clients by the same attorneys" "collateral estoppel bars the contract claims of *all* the Plaintiffs here." (Dkt. No. 97, at 8). *See Ruiz v. Comm'r of Dep't of Transp. of City of New York*, 858 F.2d 898, 903. The Court agrees. Plaintiffs do not argue that any issue preclusion should only apply to Doe #1. Thus, the Court finds that any issue that was actually decided in the Article 78 Proceeding as to Plaintiff Doe #1 will collaterally estop all Plaintiffs in the instant action.

of Conduct was "rational" and "based on some evidence." (Dkt. No. 97-2, at 6–7). While Justice McClusky found "that the violation of [] section [2] [was] not founded upon a rational basis," he ultimately did not "disturb the punishment" because there were "violations of two rules" and the punishments were "clearly within the guidelines." (*Id.*).

Plaintiffs contend that they "are not interested in re-litigating the proprietary of the disciplinary decisions issued by the UCB or the procedures used by the UCB in reaching those decisions." (Dkt. No. 98, at 3–4). Thus, they agree with Defendants that their allegations relating to the University "1) charging Plaintiffs with patently inapplicable violations of the Code of Conduct; 2) infecting UCB proceedings with fundamental unfairness; and 3) denying Plaintiffs the right to required advisors during UCB proceedings should be dismissed." (*Id.* at 6–7). The Court agrees, given that these allegations "overlap[] with issues actually litigated and addressed by Justice McClusky." (*Id.* at 4).

However, Plaintiffs dispute that their first three claims should be dismissed in their entirety because Justice McClusky's decision "was limited to analyzing procedural defects in the disciplinary process and the validity of the three Code of Conduct violations for which the [State Court Petitioners] were found responsible." (*Id.* at 4). Thus, he "did not consider, reference or discuss Plaintiffs' claim that [the University] breached its contractual obligations *before* the disciplinary proceedings by placing them in an unauthorized quasi-suspension" or "*after* the disciplinary proceedings concluded by prematurely marking their transcripts while appeals of the UCB decisions were still pending." (Dkt. No. 98, at 4–5). Thus, Plaintiffs argue that their First and Second Claims should not be dismissed to the extent they relate to "Defendants' placement of Plaintiffs in a quasi-suspension status and Defendants' premature marking of Plaintiffs' transcripts." (*Id.* at 7).

The Court agrees with Plaintiffs. In the Article 78 Proceeding, Plaintiffs sought to annul the University's disciplinary determinations. (Dkt. No. 97-2, at 1). These determinations included suspending the State Court Petitioners and marking their transcripts. (Dkt. No. 60, ¶ 62). Justice McClusky noted that his role was limited to deciding whether the University "substantially adhered to its own published rules and guidelines for disciplinary proceedings so as to ascertain whether its actions were arbitrary and capricious," and to review the facts and determination to see if the result "shock[s] the conscience." (*Id.* at 3) (quoting *Rensselaer Soc'y of Eng'rs v. Rensselaer Polytechnic Inst.*, 260 A.D. 2d 992, 993 (1999)). Noting that Plaintiffs had raised "manifold" objections to the procedures and also alleged that the Defendants' actions and statements had tainted the disciplinary process, Justice McClusky concluded that the University "substantially complied with their procedures." (Dkt. No. 97-2, at 3–4). In reaching this conclusion, Justice McClusky only discussed certain alleged procedural defects—such as the "improper notice" and the "inability to question the non-tenured hearing board on issues of potential bias"— issues that Plaintiffs argued rendered the final determination arbitrary and capricious. (Dkt. No. 97-2, at 3–4). While the Article 78 petition referenced facts related to the quasi-suspension and the transcripts, (Dkt. No. 51-4, at 62, ¶¶ 44, 71–72; Dkt. No. 97, at 6), Plaintiff's memorandum of law did not argue that the interim measures adopted by the University—the alleged quasi-suspension and the marking and holding of Plaintiffs' transcripts while the appeals were pending—were a basis on which to overturn the University's final determination.[13] (*See* Dkt. No. 113-1). Further, Justice McClusky's opinion did not discuss these interim measures the University took before its determination was final.

---

[13] While the State Court Petitioners' Appellate Brief contained one reference to the quasi-suspension, this does not satisfy Defendants' burden of showing that issue was necessarily decided. *See Kulak*, 88 F.3d at 72.

Here, Plaintiffs are requesting damages for the interim measures, which they allege violate the Student Handbook. The UCB and UAB Decisions do not make any reference to these interim measures, (*see* Dkt. Nos. 44-6, 44-7), and it is not clear whether Justice McClusky even considered these alleged procedural defects in upholding the University's final determination, given that they were temporary measures, not part of the disciplinary determination process, and were annulled by the University's final determination to suspend Plaintiffs and mark their transcripts. The Court recognizes that the absence of any discussion of these interim measures in Justice McClusky's decision "does not preclude a finding of identity" of issues. *Linden Airport Mgmt. Corp. v. New York City Econ. Dev. Corp.*, No. 08-3810, 2011 WL 2226625, *7, 2011 U.S. Dist. LEXIS 60283, *19 (S.D.N.Y. June 1, 2011). But on this record the Court finds that Defendants have failed to show that the issues concerning the alleged procedural defects in the interim measures imposed were necessarily decided in the Article 78 Proceeding. *See King v. New York City Emps. Ret. Sys.*, 212 F. Supp. 3d 371, 405 (E.D.N.Y. 2016) (finding a breach of contract claim was not precluded because the court's holding that the court had "considered petitioner's remaining arguments and find[s] them to be without merit" was "less than explicit" and so "it should not be given preclusive effect on the breach of contract claim"); *M. Kaminsky & M. Friedberger v. Wilson*, 150 A.D.3d 1094, 1095 (2d Dep't. 2017) (party seeking to invoke issue preclusion must show "that the particular issue was actually litigated, squarely addressed, and specifically decided in a prior proceeding").[14]

### C.   Breach of Contract (First Claim)

---

[14] As set forth below in Section IV.E, the decision upholding the University's determinations of two Code of Conduct violations precludes Plaintiffs' third claim, for breach of the provision providing for a right of free expression because this right is limited to expression "in a manner that does not violate the Code of Student Conduct." (Dkt. No. 44-5, at 5). Plaintiffs conceded this claim was precluded at oral argument.

Given the preclusive effects of the Article 78 Proceeding discussed *supra* Section IV.B, Plaintiffs' First Claim has three remaining breaches of contract allegations, arising from the University: (1) "[p]lacing Plaintiffs on unauthorized quasi-suspension," (2) "[p]lacing a hold on Plaintiffs' transcripts," and (3) "[p]lacing disciplinary notations on Plaintiffs' transcripts." (Dkt. No. 60, ¶¶ 77(c), (e), (f)). Defendants contend that these claims should be dismissed because they "identify no contractual provision the University has breached," and that the University's policies authorize it "to do exactly what it did." (Dkt. No. 44-1, at 15–16). Plaintiffs contend that they have alleged that Defendants breached "specific procedural disciplinary provisions." (Dkt. No. 89-2, at 16).

To survive a motion to dismiss for a breach of contract claim under New York law, the complaint must allege facts which show: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages." *Habitzreuther v. Cornell Univ.*, No. 14-cv-1229, 2015 WL 5023719, at *5, 2015 U.S. Dist. LEXIS 112209, at *14 (N.D.N.Y. Aug. 25, 2015) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

Under New York law, "an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (citing *Carr v. St. John's Univ.*, 17 A.D.2d 632, 633 (2d Dep't), *aff'd*, 12 N.Y.2d 802 (1962)). The terms of the implied contract are "contained in the university's bulletins, circulars and regulations made available to the student." *Id.* (quoting *Vought v. Teachers Coll., Columbia Univ.*, 127 A.D.2d 654, 654 (2d Dep't 1987)). "Implicit in the contract is the requirement that the institution 'act in good faith in its dealing

with its students.'" *Id.* (quoting *Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 413–14 (1980)).

At the same time, "the student must fulfill [his] end of the bargain by satisfying the university's

academic requirements and complying with its procedures." *Id.* (quoting *Gally v. Columbia

Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998)). To "state a claim for breach of such a contract,

a student must identify 'specifically designated and discrete promises.'" *Nungesser v. Columbia

Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (quoting *Ward v. New York Univ.*, No. 99-cv-

8733, 2000 WL 1448641, at *4, 2000 U.S. Dist. LEXIS 14067, at *11 (S.D.N.Y. Sept. 28,

2000)). "'General policy statements' and 'broad and unspecified procedures and guidelines' will

not suffice." *Id.* (quoting *Ward*, 2000 WL 1448641, at *4, 2000 U.S. Dist. LEXIS 14067, at

*10); *see also Gally*, 22 F. Supp. 2d at 208 ("[G]eneral promises about ethical standards" that are

"subject to neither quantification nor objective evaluation" "are far different from the types of

specific promises which have led to valid breach of contract claims against universities.").

### 1.     Quasi-Suspension

In section 4.1, the Student Handbook provides that "the status of a respondent will not be

changed" while a disciplinary case is pending, "unless the Director of Student Rights and

Responsibilities, in consultation with the Senior Vice President for Enrollment and the Student

Experience, or a designee, determines that an interim suspension is required to promote the

safety and well-being of the University community." (Dkt. No. 44-5, at 10). Section 4.2 states

that if a student is suspended on "an interim basis pending the outcome of proceedings against

them," they will be "given the opportunity to be heard by the University Appeals Board on the

merits of the decision to impose the interim suspension within three (3) University business days

of receipt by the Office of Student Rights and Responsibilities of the student's written request for

such a hearing." (*Id.*).

Plaintiffs contend that they were "suspended from attending any classes, labs, or academic functions at the University," and this "quasi-suspension" violated Student Handbook sections 4.1 and 4.2. (Dkt. No. 60, ¶¶ 53, 55). Specifically, Plaintiffs allege that they were informed they were "suspended" but "the University did not follow[] the procedures in [the Student Handbook section] 4.1." (*Id.* ¶ 79). Further, "Defendants specifically denied that Plaintiffs had been placed on an 'interim suspension,'" effectively "deny[ing] Plaintiffs the opportunity to formally appeal the suspension." (*Id.* ¶¶ 80–81).

Defendants argue that this claim should be dismissed because "even if accepted as true for the purposes of the instant motion" that Plaintiffs were placed on a "quasi-suspension," "any restrictions placed on Plaintiffs' ability to attend classes . . . could not form the basis for a breach of contract claim, because the University was expressly authorized to impose such restrictions" under section 4.1 in order to "'promote the safety and well-being of the University community.'" (Dkt. No. 44-1, at 18 (quoting Dkt. No. 44-5, at 10) (emphasis omitted)).

Even assuming that the University was "expressly authorized" to place Plaintiffs on an interim suspension under section 4.1 in order to promote the safety of the University community, Defendants do not address Plaintiffs' allegations that, at the time, the University "specifically denied" they were suspended and thus "den[ied] Plaintiffs the opportunity to formally appeal the suspension," (Dkt. No. 60, ¶¶ 80–81), in violation of section 4.2. (Dkt. No. 44-5, at 10). Accordingly, drawing all inferences in Plaintiffs' favor, Plaintiffs have plausibly alleged that the University breached the interim suspension policy.[15]

---

[15] Defendants argue that the University had the right to "modify its conduct procedures and appeals processes" in this case. (Dkt. No. 44-1, at 18) (citing to Student Handbook, Part 13). In Part 13, "Modification of Procedures," the University reserved the right to "modify its conduct procedures and appeals processes . . . when safety and security issues so demand." (Dkt. No. 44-5, at 25). This provision further states that "[m]odified procedures nonetheless will provide students with the required elements of fundamental fairness." (*Id.*). The "Fundamental Fairness" section provides that "[s]tudents have the right to written notice and the opportunity for a hearing before any change in status is incurred for disciplinary reasons unless a *significant* threat to persons or property exists." (*Id.* at 5 (emphasis added)).

### 2.      Transcripts

Plaintiffs raise two breach of contract claims related to their transcripts: (1) the University "plac[ed] a hold on Plaintiffs' transcripts," and (2) it "plac[ed] disciplinary notations on Plaintiffs' transcripts while appeals of non-Title-IX-related charges were pending." (Dkt. No. 60, ¶¶ 77(e), (f)). The Court will address each of these claims in turn.

### a.      Transcript Hold

Section 10.10 of the Student Handbook states that, for Title IX cases, "[a] hold will be placed on the respondent's academic records until a final resolution of the complaint." (Dkt. No. 44-5, at 18). In this case, Plaintiffs allege that the University placed a hold on their transcripts "based on frivolous Title IX charges," and then continued to hold their transcripts "after the Title IX charges were dropped." (Dkt. No. 60, ¶ 77(e)). Defendants contend that this claim should be dismissed because "Plaintiffs fail to allege Defendants violated any specific disciplinary code provision." (Dkt. No. 44-1, at 15 (citing *Nungesser*, 169 F. Supp. 3d at 370)).

The Court agrees with Defendants. "A student asserting a breach of contract claim must identify the specific terms of the implied contract that were allegedly violated by the college (such as an internal rule, regulation, or code), and failure to do so is fatal to the claim." *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 406 (W.D.N.Y. 2017). Here, section 10.10 of the Student Handbook explicitly provides that a hold will be placed on a student's transcript in the Title IX context. (Dkt. No. 44-5, at 18). Plaintiffs seemingly argue that, by omission, the provision that a hold *must be* placed on a student's transcript in the Title IX context means that the University has a policy such that it is *not allowed to* hold a student's transcript when other proceedings are pending. The Third Amended Complaint does not identify any specific terms of

---

At this preliminary stage, construing all inferences in favor of Plaintiffs, they have plausibly stated a breach of contract claim based on their suspension without an opportunity for a hearing.

the Student Handbook or other University policies that give students a "right to obtain unmarked transcripts" while disciplinary proceedings are pending.[16] (Dkt. No. 60, ¶ 91). *See Ward*, 2000 WL 1448641, at *5, 2000 U.S. Dist. LEXIS 14067, at *15 ("[B]ald assertions and conclusory allegations claiming that the University's rules or procedures were not followed, do not state a valid claim."). Accordingly, Defendants' motion to dismiss Plaintiffs' breach of contract claim regarding the hold on their transcripts is granted.

**b.      Transcript Mark**

Section 12.1 of the Student Handbook states that "decisions of the respective boards are effective immediately, unless a written notice of intention to appeal has been received." (Dkt. No. 44-5, at 24). Section 14.3 states that "[s]tudents found to be responsible for non-violence related violations *who are suspended* or expelled will have the following notation listed on their transcript: 'Administrative Withdrawal – University Initiated.'" (*Id.* at 26 (emphasis added)). Plaintiffs allege that Defendants "prematurely marked Plaintiffs' transcripts" while their appeal was still pending. (Dkt. No. 60, ¶ 59). Defendants argue that the Third Amended Complaint "fails to identify a specific provision of [the Student Handbook] that this alleged act violated." (Dkt. No. 44-1, at 16).

Here, Plaintiffs have identified a specific provision that the University alleged violated— that the UCB's decision would not be effective during the pendency of their appeal. (Dkt. No. 44-5, at 24). While section 14.3 allows transcripts to be annotated for students who *are* suspended, (*id.* at 26), the UCB's suspension of Plaintiffs was not yet in effect because they

---

[16] In their reply, Defendants argue that "[a]s the Court noted in its decision denying Plaintiffs' request for a preliminary injunction, the University Registrar's website clearly states its normal policy that 'Transcripts are not released for students or alumni with outstanding financial or conduct obligations.'" (Dkt. No. 93, at 9 (quoting Dkt. No. 24, at 9)). However, the contents of the University Registrar's website are not appropriately considered on this motion to dismiss for failure to state a claim. *See Faulkner*, 463 F.3d at 134.

"appealed the UCB Decision to the UAB in a timely and proper manner." (Dkt. No. 60, ¶ 63). Accordingly, drawing all inferences in Plaintiffs' favor, they have adequately alleged a breach of contract related to the premature marking of their transcripts.

Defendants allege that they acted in accordance with Student Handbook section 15.1, which provides that "[a] student who chooses to withdraw from the University rather than participate in the conduct process may be classified as having been withdrawn for disciplinary reasons. This status will be noted on the student's transcript as 'Administrative Withdrawal – University Initiated.'" (Dkt. No. 44-5, at 26; Dkt No. 44-1, at 16). However, as Plaintiffs argue, this section does not support the Defendants' motion to dismiss because the record before the Court alleges that "Plaintiffs did not withdraw from the University; rather they fully participated in the disciplinary process and filed appeals." (Dkt. No. 89-2, at 16; *see also* Dkt. No. 60, ¶ 63). The Court thus declines to dismiss this claim.

### D.     Breach of the Covenant of Good Faith and Fair Dealing (Second Claim)

Plaintiffs allege that the University breached the covenant of good faith and fair dealing. (Dkt. No. 60, ¶¶ 87–94). They argue that this claim survives "to the extent it alleges a breach of duty of good faith and fair dealing regarding Defendants' placement of Plaintiffs in a quasi-suspension status and Defendants' premature marking of Plaintiffs' transcripts." (Dkt. No. 98, at 7). Defendants argue that the good faith and fair dealing claims should be dismissed because they "simply re-allege[] the same procedural and substantive critiques . . . that Plaintiffs have already alleged as breach of contract," and a "'breach of the implied covenant of good faith and fair dealing claim that is duplicative of a breach of contract claim must be dismissed.'" (Dkt. No. 44-1, at 19–20 (quoting *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 482 (S.D.N.Y. 2015))).

New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same

facts, is also pled." *Nungesser*, 169 F. Supp. 3d at 372–73 (quoting *Yu*, 97 F. Supp. 3d at 482);

*see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("[W]hen a complaint

alleges both a breach of contract and a breach of the implied covenant of good faith and fair

dealing based on the same facts, the latter claim should be dismissed as redundant."). Since

Plaintiffs' allegations regarding their quasi-suspension and transcripts also underpinned their

breach of contract claims, their claim for breach of the implied covenant of good faith and fair

dealing must be dismissed. *Doe v. Syracuse Univ.*, No. 18-cv-377, 2019 WL 2021026, at *12,

2019 U.S. Dist. LEXIS 77580, at *34–35 (N.D.N.Y. May 8, 2019) (dismissing implied covenant

of good faith and fair dealing claim when "[a] close examination of the facts alleged . . . reveals

that both claims, at essence, arise from the same operative facts and seek the same damages");

*Nungesser*, 169 F. Supp. 3d at 373 (dismissing implied covenant of good faith and fair dealing

claim when the plaintiff "failed to plead any facts, separate from the facts with which he attempts

to state a claim for breach of contract in support of his claim for a breach of the covenant of good

faith and fair dealing").

### E.   Breach of Contract for Violating Plaintiffs' Contractually Protected First Amendment Rights (Third Claim)

Part 1 of the Statement of Student Rights and Responsibilities states that "[s]tudents have

the right to express themselves freely on any subject *provided they do so in a manner that does

not violate the Code of Student Conduct*." (Dkt. No. 44-5, at 5 (emphasis added)). The Code of

Conduct prohibits harassment that "is beyond the bounds of protected speech, directed at a

specific individual(s), easily construed as 'fighting words,' or likely to cause an immediate

breach of the peace." (*Id.* at 6). Plaintiffs allege that these provisions mean the University

"contractually guaranteed" their right to freedom of expression, which the University violated

when it punished them for protected speech. (Dkt. No. 60, ¶¶ 95–101). Defendants contend that

this claim should be dismissed because, inter alia, "[t]he University found Plaintiffs' conduct violated sections 3 and 5 of the Code of Student Conduct, and thus that conduct falls outside of the speech protected by the Free Expression Statement." (Dkt. No. 44-1, at 23).

The Court agrees with Defendants. To the extent Plaintiffs' breach of contract claim is based on Part 1 of the Statement of Student Rights and Responsibilities, this provision explicitly exempts speech that violates the Code of Conduct. (Dkt. No. 44-5, at 5). In the Article 78 Proceeding, Justice McClusky upheld the University's determination that Plaintiffs violated sections 3 and 15 of the Code. (Dkt. No. 97-2). Plaintiffs thus cannot base their breach of contract claim on this provision, because by its terms, they only had the contractual "right to express themselves freely" if the speech did not otherwise violate the Code, and Justice McClusky upheld the University's determinations that their speech did violate the Code. Similarly, to the extent Plaintiffs' breach of contract claim is based on section 2 of the Code, it similarly fails—this provision prohibits harassment "which is beyond the bounds of protected speech," (Dkt. No. 44-5, at 6), but is not a "specifically designated and discrete promise[]'" that students have a right to free expression. *Nungesser*, 169 F. Supp. 3d at 370) (quoting *Ward*, 2000 WL 1448641, at *4, 2000 U.S. Dist. LEXIS 14067, at *11). Accordingly, this claim is dismissed.

### F.   Defamation (Fourth Claim)

Plaintiffs allege that Chancellor Syverud, Dean Hradsky, and Dean Abi-Nader Dahlberg defamed them by "knowingly, negligently, or recklessly, published, distributed, and circulated false accusations and statements regarding Plaintiffs as a small group of participants in the Roast." (Dkt. No. 60, ¶ 103). Defendants contend that these claims should be dismissed because: (1) their statements were opinions, which "under New York law . . . are not actionable," (2) Plaintiffs' allegations do not contain "plead[ed] facts that, if proven, would allow a reasonable person to consider the statements false," (Dkt. No. 44-1, at 28 (quoting *Tannerite Sports, LLC v.*

*NBCUniversal News Grp. ("Tannerite II")*, 864 F.3d 236, 247 (2d Cir. 2017)), and (3) the statements cannot be understood as "of and concerning" Plaintiffs. (*Id.* (quoting *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001))).

In New York, "[d]efamation is 'the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.'" *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 34 (1st Dep't 2014) (quoting *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996)). "Statements that falsely charge plaintiffs with 'serious' criminal activity are defamatory *per se*." *Goldman v. Reddington*, 417 F. Supp. 3d 163, 171 (E.D.N.Y. 2019). To establish a defamation claim, a Plaintiff must show: "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017).

"Under New York law, statements that express opinions or hyperbole, rather than facts, do not constitute actionable defamation." *Goldman,* 417 F. Supp. 3d at 172 (citing *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 779 F.3d 191, 202 (2d Cir. 2015)); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000) ("[T]he New York Constitution provides for absolute protection of opinions."). Whether a statement constitutes "fact or opinion is a question of law for the court." *Cummings v. City of New York*, No. 19-cv-7723, 2020 WL 882335, at *20, 2020 U.S. Dist. LEXIS 31572, at *55 (S.D.N.Y. Feb. 24, 2020) (citing *Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014)). New York courts consider three factors in making this determination:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader

> social context and surrounding circumstances are such as to signal
> readers or listeners that what is being read or heard is likely to be
> opinion.

*Cummings*, 2020 WL 882335, at *20, 2020 U.S. Dist. LEXIS 31572, at *55 (quoting *Brian v.*

*Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995)). "Ultimately, the 'dispositive inquiry is

whether a reasonable reader could have concluded that the statements were conveying facts

about the plaintiff.'" *Id.* (quoting *Ratajack v. Brewster Fire Dep't, Inc. of the Brewster-Se. Joint*

*Fire Dist.*, 178 F. Supp. 3d 118, 159 (S.D.N.Y. 2016)).

"When, however the statement of opinion implies that it is based upon facts which justify

the opinion but are unknown to those reading or hearing it, it is a 'mixed opinion' and is

actionable." *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986). Courts consider "the important

distinction between a statement of opinion that implies a basis in facts which are not disclosed to

the reader or listener and a statement of opinion that is accompanied by a recitation of the facts

on which it was based or one that does not imply the existence of undisclosed underlying facts."

*Frascatore v. Blake*, 344 F. Supp. 3d 481, 494 (S.D.N.Y. 2018) (quoting *Elias*, 872 F.3d at 110–

11).

"Additionally, the complaint must allege that a defamatory statement was 'of and

concerning' the plaintiff." *Goldman*, 417 F. Supp. 3d at 172. "The test in this circuit is whether

'the libel designates the plaintiff in such a way as to let those who knew [the plaintiff]

understand that [s]he was the person meant. It is not necessary that all the world should

understand the libel.'" *Daytree at Cortland Square, Inc. v. Walsh*, 332 F. Supp. 3d 610, 629

(E.D.N.Y. 2018) (quoting *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 925 (2d Cir.

1987)). While this requirement "is generally an issue of fact for the jury to decide, the court may

properly dismiss an action where the libelous statement is 'incapable of supporting a jury's

finding' that it refers to the plaintiff." *Goldman*, 417 F. Supp. 3d at 172 (quoting *Greene v.*
*Paramount Pictures Corp.*, 138 F. Supp. 3d 226, 234 (E.D.N.Y. 2015)).

### 1.     Chancellor Syverud

Plaintiffs identify four statements by Chancellor Syverud in the Third Amended
Complaint that they assert are defamatory: (1) on April 18, 2018, Chancellor Syverud sent a
message to the University community that stated that "the University learned of extremely
troubling and disturbing conduct at . . . Theta Tau" and "[v]ideos showing this offensive
behavior have surfaced online. They include words and behaviors that are extremely racist, anti-
semitic, homophobic, sexist, and hostile to people with disabilities" ("Statement One"), (Dkt.
No. 60-1, at 2); (2) on April 18, 2018, he gave an address at the University Senate meeting, in
which he stated that he "had watched part of the videos from Theta Tau. [He] believed [he]
described the videos accurately in the message I sent out earlier today [in Statement One]: this is
racist, anti-Semitic, homophobic, sexist, and ableist, by which I mean hostile to people with
disabilities" (Statement Two"), (*id.* at 4–5); (3) on April 20, 2018, he sent a message to the
University community and wrote that "[a]s I told the campus community, the video was
extremely racist, anti-Semitic, homophobic, and hostile to people with disabilities" ("Statement
Three"), (*id.* at 15); and (4) on April 22, 2018, he sent a message to the University community
that stated that:

> Last night the Daily Orange released an additional video of the
> behavior at the Syracuse University chapter of Theta Tau. The video
> depicts sexual assault, physical violence and grotesque hostility
> toward and mockery of people with physical intellectual and other
> disabilities . . .
>
> This additional video is part of the evidence Syracuse University
> received on Wednesday and immediately referred for potential
> criminal investigation to local law enforcement and for student
> judicial proceedings. It is not the only evidence, and there are other

videos as well. We do not reveal evidence in an ongoing potential criminal and judicial investigation . . .

Now that the media has released this second video, I can comment more specifically on it than I have been able to in my previous statements . . . In my specific comments on the first video, I have noted that its disgusting content included extreme and egregious racism, sexism, ableism, anti-Semitism and homophobia.

("Statement Four"). (*Id.* at 18 (emphasis omitted)).

### a.    Statements characterizing the videos

Regarding Chancellor Syverud's characterization of the videos as "racist, anti-semitic, homophobic, sexist, and hostile to people with disabilities" in Statements One, Two, Three, and Four, (Dkt. No. 60-1, at 2, 4–5, 15, 18), Defendants contend that "cases make clear that characterizing offensive material as 'racist' or 'anti-Semitic'—precisely what the Plaintiffs allege the Defendants did here—is non-actionable opinion." (Dkt. No. 44-1, at 26–27). The Court agrees. "Courts in New York have consistently held that terms like 'racist' constitute nonactionable opinion." *Cummings*, 2020 WL 882335, at *20–21, 2020 U.S. Dist. LEXIS 31572, at *56 (holding that statements that the plaintiff was racist were nonactionable opinion because the statements "indicate[d] that Plaintiff's accusers viewed her actions as racist – an opinion about her conduct, rather than a factual assertion"); *Silverman v. Daily News, L.P.*, 129 A.D.3d 1054, 1055 (N.Y. App. Div. 2015) (affirming the district court's opinion that the statements at issue, articles that referred to materials authored by the plaintiff as "racist writings," were "such that a reasonable reader would have concluded that he or she was reading opinions, and not facts, about the plaintiff"); *Russell v. Davies*, 97 A.D.3d 649, 650 (2d Dep't 2012) (holding that news stories that labeled an essay written by the plaintiff as "racist" and "anti-Semitic" were nonactionable opinions, not facts). A reasonable reader could not conclude that Chancellor Syverud's statements that the videos were racist, anti-Semitic, homophobic, sexist, and ableist

conveyed facts about Plaintiffs, rather than his opinion about what the videos depicted. At oral argument, Plaintiffs conceded that the Chancellor's characterization of the videos was his opinion, and thus not actionable as defamation.

### b.     Statements regarding the criminal investigation

In Statement Four, Chancellor Syverud stated that "[t]he [second] video depicts sexual assault" and "physical violence," and that it was "part of the evidence Syracuse University received on Wednesday and immediately referred for potential criminal investigation to local law enforcement and student judicial proceedings . . . We do not reveal evidence in an ongoing potential criminal and judicial investigation so as not to prejudice that investigation." (Dkt. No. 60-1, at 18). At oral argument, Plaintiffs clarified that their defamation claim against Chancellor Syverud rests on these statements.

Plaintiffs contend these statements are defamatory because they described the "conduct as 'criminal' even after Onondaga County District Attorney William Fitzpatrick stated there was 'nothing' criminal about the videos," they merely depicted "rank stupidity, . . . luckily stupidity is not a crime." (Dkt. No. 60, ¶ 48). Defendants contend that these statements are not objectively false, and therefore cannot sustain a defamation claim. (Dkt. No. 93, at 13).

In a defamation action, plaintiffs "have the burden of alleging that a defamatory statement is false, or at least 'not substantially true.'" *Goldman*, 417 F. Supp. 3d at 171 (quoting *Tannerite II*, 864 F.3d at 247). "To survive a motion to dismiss, plaintiffs must do more than 'perfunctorily state that a statement is false.'" *Id.* (quoting *Cabello-Rondon v. Dow Jones & Co., Inc.*, No. 16-cv-3346, 2017 WL 3531551, at *4, 2017 U.S. Dist. LEXIS 131114, at *15 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 720 F. App'x 87 (2d Cir. 2018)). Rather, plaintiffs "must identify how the defendant's statement was false" and "plead facts, if proven, would allow a

reasonable person to consider the statement false." *Id.* (quoting *Tannerite II*, 864 F.3d at 245–47).

Here, Plaintiffs have failed to allege how Chancellor Syverud's statements that the video depicted sexual assault and physical violence, and that the University referred the videos for potential criminal investigation to local law enforcement, are false. While the Third Amended Complaint generally alleges that Defendants "knowingly, negligently, or recklessly, published, distributed, and circulated false accusations and statements regarding Plaintiffs," (Dkt. No. 60, ¶ 103), this conclusory allegation fails to specifically allege how Chancellor Syverud's statements are false. *See Cabello-Rondon*, 2017 WL 3531551, at *5 2017 U.S. Dist. LEXIS 131114, at *14 (dismissing a defamation claim where the plaintiff "failed to adequately plead that [the] statements [were] materially false because he has not challenged the 'gist or substance' of those statements").

First, regarding Chancellor Syverud's statement that the second video depicted sexual assault and physical violence, the Third Amended Complaint does not allege this statement is false—rather, the Complaint itself alleges that the video "depicted [a] member unable to communicate about anything other than how much he loved his girlfriend" being "'light rape[d]' as he sat in a wheelchair." (Dkt. No. 60, ¶ 34). Second, Plaintiffs do not allege that the Chancellor's statement that the case was referred "for potential criminal investigation" to local enforcement is false. The fact that after the case was referred, the district attorney allegedly stated that nothing criminal had occurred does not render Chancellor Syverud's statement that a referral was made false.

To the extent that Plaintiffs are arguing that Chancellor Syverud's statement was true, but was nevertheless defamation by implication, it similarly fails. "Defamation by implication

involves 'false suggestions, impressions and implications arising from otherwise truthful statements.'" *Ello v. Singh*, 531 F. Supp. 2d 552, 579 (S.D.N.Y. 2007) (quoting *Levin v. McPhee*, 119 F.3d 189, 196 n.5 (2d Cir. 1997)). "[U]nder New York law, "a plaintiff alleging defamation by implication must 'show that [d]efendants affirmatively intended such an implication.'" *Cabello-Rondon*, 2017 WL 3531551, at *7, 2017 U.S. Dist. LEXIS 131114, *18 (quoting *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 465–66 (S.D.N.Y. 2012)). "New York courts have . . . been hesitant to find defamation based on the omission of facts, unless the omitted facts would materially change the meaning of the statements that are expressed." *Marom v. Pierot*, No. 18-cv-12094, 2020 WL 1862974, at *10, 2020 U.S. Dist. LEXIS 8763, at *29–30 (S.D.N.Y. Jan. 16, 2020), *report and recommendation adopted*, 2020 WL 1444938, 2020 U.S. Dist. LEXIS 53527 (S.D.N.Y. Mar. 25, 2020) (quoting *Biro*, 883 F. Supp. 2d at 466). In order to survive a motion to dismiss, a plaintiff must "make a rigorous showing that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Tannerite Sports, LLC v. NBC Universal Media LLC ("Tannerite I")*, 135 F. Supp. 3d 219, 232 (S.D.N.Y. 2015), *aff'd*, 864 F.3d 236 (2d Cir. 2017).

Here, Plaintiffs are alleging that Chancellor Syverud's statements are defamatory because they falsely suggest that Plaintiffs engaged in criminal activities because he said that the video depicted sexual assault and was referred for criminal investigation. However, reading these statements in context, Chancellor Syverud's message was focused on explaining why he had not commented on the contents of the second video previously—he had been "constrained in what [he] could say" because the University does "not reveal evidence in an ongoing potential criminal and judicial investigation so as not to prejudice that investigation." (Dkt. No. 60-1, at

18). Now that the second video had been released by the media, Chancellor Syverud could "comment more specifically on it." (*Id.*). Thus, in context, these statements cannot reasonably be read to impart the false innuendo that Plaintiffs are criminals, nor have Plaintiffs alleged sufficient facts that the Chancellor endorsed that inference. *See Martin v. Hearst Corp.*, 777 F.3d 546, 553 (2d Cir. 2015) (upholding the dismissal of a defamation by implication claim where the defendant had stated that the plaintiff was arrested and charged, but omitted the fact that the charges had been dismissed, because while it "may not be as complete a story as [the plaintiff] would like . . . it implies nothing false about her"); *Marom*, 2020 WL 1862974, at *11, 2020 U.S. Dist. LEXIS 8763, at *31 (dismissing a defamation by implication claim where "the statements in context merely set forth what the underlying court records demonstrated" even though the defendant had omitted that the judgment had been vacated, because the plaintiff had failed to make "the rigorous showing required under New York law demonstrating that the statements 'imparted a defamatory inference' and that [the defendant] 'intended or endorsed that inference'" (quoting *Wilson v. New York*, No. 15-cv-23, 2018 WL 1466770, at *4–5, 2018 U.S. Dist. LEXIS 49609, at *16 (S.D.N.Y. Mar. 26, 2018))). Accordingly, the Court dismisses the defamation claims against Chancellor Syverud.

### 2.     Dean Abi-Nader Dahlberg

Plaintiffs assert that Dean Abi-Nader Dahlberg's statement that "[t]his week, the Syracuse University campus was shown very ugly, disturbing behavior . . . A serious of videos was uncovered that showed that some members of the Theta Tau professional engineering fraternity using racist, anti-Semitic, homophobic, sexist, and ableist language," (Dkt. No. 60-1, at 12), is defamatory. Even assuming that there is a plausible argument that Defendant Dahlberg's statement regarding the language in the video was false, as discussed *supra* Section IV.F.1, her statement that the behavior was "ugly" and "disturbing," and that the videos contained "racist,

anti-Semitic, homophobic, sexist, and ableist language" are expression of opinion. Accordingly, this claim is dismissed.

### 3.    Dean Hradsky

The Third Amended Complaint alleges that Dean Hradsky "falsely stated the video depicted actual 'sexual and relationship violence.'" (Dkt. No. 60, ¶ 47(b)). As Defendants argue, "[a] defamation claim 'is only sufficient if it adequately identifies the purported communication, and an indication of who made the communication, when it was made, and to whom it was communicated.'" (Dkt. No. 44-1, at 25 (quoting *Thai v. Cayre Group, Ltd.*, 726 F. Supp. 2d 323, 329 (S.D.N.Y. 2010) (internal quotation marks omitted))). Though the Third Amended Complaint references Exhibit A, this exhibit contains no such statement by Dean Hradsky. (*See* Dkt. No. 60-1). Thus, Plaintiffs' defamation claim as to Dean Hradsky's statement is insufficient for failing to state when and to whom the statement was communicated.

## II.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) (Dkt. No. 44) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendants' Motion to Dismiss is **GRANTED** as to Plaintiffs' claims for violations of the implied duty of good faith and fair dealing (Second Claim) and defamation (Fourth Claim), and those causes of action are **DISMISSED**; and it is further

**ORDERED** that Defendants' Motion to Dismiss the breach of contract claims (First Claim) is **DENIED** as to Plaintiffs' claims regarding their quasi-suspensions and the marking of their transcripts, and is otherwise **GRANTED**.

**IT IS SO ORDERED.**

Dated: June 19, 2020

Brenda K. Sannes
U.S. District Judge